**TABACALERA SEVERIANO JORGE, S. A., and Severiano Jorge, Appellants,**

v.

**STANDARD CIGAR COMPANY, Appellee.**

**No. 24320.**

United States Court of Appeals Fifth Circuit.

March 18, 1968.

Rehearing Denied May 23, 1968.

Thomas Anderson, Shutts & Bowen, Miami, Fla., for appellants.

William A. Gillen, Tampa, Fla., W. G. Ward, Miami, Fla. (amicus curiae), Fowler, White, Collins, Gillen, Humkey & Trenam, Tampa, Fla., for appellee.

Before TUTTLE and WISDOM, Circuit Judges, and HEEBE, District Judge.

TUTTLE, Circuit Judge:

This is an appeal from a judgment by the trial court dismissing a suit by a Cuban corporation and/or its sole stockholder as assignee for the purchase price of approximately $100,000 worth of tobacco sold and delivered to the Standard Cigar Company, of Tampa, Florida, a few months before the Cuban government "intervened" the plaintiff company in Havana. The trial court held that the act of the Cuban government in appointing an "interventor" on September 15, 1960, was "an act of state" which took away from the officers, directors and stockholders, as well as all other persons, whatever rights had theretofore been held by the corporation in the unpaid balance owed by the Tampa-based Standard Cigar Company; that the United States courts are bound to accept as binding on them under the "Act of State Doctrine," such adverse action by the Cuban government, and that, therefore, neither the corporation Tabacalera Severiano Jorge, nor Severiano Jorge, as assignee of the corporation, resident in the state of Florida, could recover the account in the United States courts.

Since the District Court disposed of the case by entering a summary judgment of dismissal, the facts, of course, are to be taken in the light most strongly in favor of the losing party, that is to say, the plaintiffs in the court below, the appellants here. Viewed in such light, the facts are as follows:

Prior to 1954, Severiano Jorge y Cepero, a resident of Havana, Cuba, was successfully engaged in the tobacco business operating a sole proprietorship. In 1954, he incorporated under the name Tabacalera Severiano Jorge, S. A., owning all the equitable interest in the stock of the corporation. As such stockholder he caused one Higinio Miguel Caso, a tobacco buyer, to be elected president.

However, at the time of such election, the corporation, at a duly held stockholders meeting was directed to execute and deliver to him, and to his accountant, a vice-president and the treasurer of the new corporation, Jose Romano, a broad power of attorney. This power of attorney appears to be about as broad as can conceivably be devised to give to these two named persons as much power as is normally enjoyed by the officers and directors of an American corporation. They included the following:

"FIRST: Administer, rule and govern all of the estate of the firm TABACALERA SEVERIANO JORGE, SOCIEDAD ANONIMA, whether consisting of real or personal property, which they may today possess or in the future acquire; guard its conservation and development; hire and discharge employees considered unsuitable; check all work; improvements and repairs which they may deem necessary to be done; obtain the necessary licenses and certificates of habitability; set forth all new constructions, recording same in the Registry of Properties; assess and determine the rents of income therefrom, pay any and all taxes, water bills and other obligations affecting said real or personal property, as well as those expenses arising from said constructions, repairs and improvements, exercising due and diligent care as any zealous and capable administrator should.

\* \* \* \* \* \*

"THIRD: To deposit in withdraw from banks, bankers, organizations or business enterprises, any monies which may be therein or thereafter deposited, authorizing the necessary mandates in order to endorse and collect any sums in favor of said constituent company; being allowed to borrow money in the name of said Company, with or without guarantee, including overdraws, maintaining overdraws in any account or accounts which the Company may have with any banking institution in this City and the Island, so that the empowered attorneys herein designated may exercise any and *all acts of administration and dominion over personal property, real property, movables, and any other kind of possession in the name of the company,* as well as accept drafts, discount same, protest same, and obtain monies from any banking institution with which it maintains business relations, including the acceptance of monies through overdraws, with or without interest.

\* \* \* \* \* \*

"SIXTH: *To collect and receive all proceeds, amounts, terms, rents, dividends and profits of the said estate, and all other amounts, produce, effects, values and fees which may under any title or for any reason be due and owing now or in the future, subscribing to said receipts and securities.*

\* \* \*

"SEVENTH: *To settle disputes with regard to claims, lawsuits and questions of interest to the constituent company, in the terms, manner and forms which they may deem convenient, or through legal or friendly claims arbitrators, having the power to enforce the fulfillment of their decisions and the payment of the fines.*"

(Emphasis supplied).

For several years prior to 1960, the corporation sold substantial quantities of tobacco to the Standard Cigar Company of Tampa, Florida. It acquired this tobacco by buying it from tobacco farmers in Cuba. The sales of tobacco to Standard were on account without any written agreement as to the time and place of payment. Between July 1 and July 25, 1960, Tabacalera sold and shipped tobacco to Standard for the sales price of $100,894.28. At about this same time Severiano Jorge left Havana and came to the United States, where he took up his residence. During the summer months of 1960, he solicited approximately one million dollars worth of additional sales for Tabacalera, none of which were filled prior to September 15th, the date of the intervention. In June, Jorge per-

sonally loaned to Tabacalera $75,000 of his own funds and in August advanced an additional $600,000. Both of these amounts were put on deposit in the Havana branch of a New York bank. A substantial part of this sum was utilized by Tabacalera to pay tobacco growers for purchases that had been made from them in Cuba. Part was for payroll purposes. In his affidavit in support of the appellants' motion for summary judgment, Jorge asserts "the funds thus advanced were proceeds derived from the sale of my cattle ranch. It was understood by everyone, including Higinio Miguel Caso [the then president of the corporation], that I would be repaid for said advances out of the proceeds of the resale of the tobacco to the companies in the United States, including defendants herein."

No testimony disputing this statement is in the record.[1]

During the months of July and August, Jorge made demands on Standard Cigar Company in the name of Tabacalera for payment of the outstanding balance due to the corporation. In his affidavit Jorge stated:

"In accordance with the long standing custom and practice of the tobacco industry in Cuba, the purchase price for tobacco was due no later than the Monday following the buyer's acceptance. While I made certain limited exceptions which were granted only after negotiations therefor, the accounts of the defendants herein for the shipments made in July, 1960, were due and payable immediately upon the receipt of the tobacco by the purchasers. There was no custom, agreement or understanding between the corporation and these defendants that they would be allowed between 90 and 120 days after each of the shipments made in July, within which to pay the purchase price therefor."

The latter part of this affidavit was in response to an affidavit by Stanford Newman, president of the Standard Cigar Company. Newman alleged that the tobacco in question, "was purchased by purchase orders and accepted in Havana, Cuba, and was shipped f. o. b. Havana, Cuba, to the defendant in Tampa, Florida, as aforesaid. In accordance with the customs, agreements and understandings between the plaintiff and the defendant, the purchase price of each shipment was due and payable by the defendant to the plaintiff in Havana, Cuba, 90 to 120 days after each shipment."

Presumably the trial court considered that it was not relevant to the decision of the case that it resolve the conflict in this testimony, which on the one hand provided for payment well in advance of the "takeover" of September 15th, and which, on the other hand, provided for payment at a date that had not yet arrived when the intervenor was put in charge in Havana We agree that it is immaterial whether the payments were actually payable prior to September 15th or were owing but payable at a later date.

On the 15th day of September, 1960, the revolutionary government of the Republic of Cuba promulgated resolution number 20260 of its Ministry of Labor, by which it "intervened" the Cuban tobacco industry, including the plaintiff corporation. While it may be assumed that the revolutionary government, which, at the time, was all powerful in Cuba, could in actual effect have physically done just about what it wished to do with respect to any property or person within its territorial reach, we think it important that the precise powers given to the intervenor named for this corporation be carefully studied. These powers are contained in a resolution published by the Cuban Minister of Labor. This resolution directs that in-

---

1. While we mention this fact as a part of the total background of the case, our disposition of the case does not depend upon the existence of the informal arrangement here depicted.

terventors are appointed to do the following things:

"THIRD:—Substitute in position and degree, the Directors of the intended industries intervened, with the Interventors designated above, with the power to open bank accounts, open credit, accept, endorse discount or in any other form negotiate payments, letters or any other commercial documents, solicit or obtain credit, carry on the operation of buying or selling the National or foreign currencies, take money or loans with or without guarantees, stipulate type of interests, maturity, location of payments, class of currency and all other particulars esteemed convenient. Contract when considered opportune for payments of current accounts. Attach, mortgage or in any way encumber any benefits pertaining to the enterprises; buy, exchange, sell or in any other form operate in or with shares, bonuses, or other valuables, rent vaults, depositing in same and withdrawing its contents liberally; contract conditions of employment with the laborers and employees of these enterprises; also, subscribe collective contracts of work in their name, pay the stipulated wages of employees and laborers; represent the enterprises legally in courts and out of courts and say other facility necessary for the development of its function.

"FOURTH:—Order the designated Interventors to take inventory and appraisal of the goods and furniture pertaining to the intervened enterprises.

"FIFTH:—Notify all parties in the proper legal procedure."

One Armando Lebato Alvarez was named as the interventor of Tabacalera and he physically took possession of the premises, books and records of Tabacalera Severiano Jorge in Havana, Cuba, including tobacco in the warehouse, which, according to Jorge's undisputed affidavit, had a value in excess of $1,000,000.00. Jorge, the individual, learned of this fact on September 15th in a telephone conversation in which he was reporting to his company in Havana that he had made certain sales on behalf of the company. Thereupon, on September 16th, he wrote to Standard Cigar Company a letter demanding payment on account of Tabacalera Severiano Jorge, S. A., in his care.[2]

Enclosed in the letter was a copy of a duly executed power of attorney incorporating the relevant by-laws of Tabacalera Severiano Jorge, and the certificate of the action by the stockholders and the certificate of the appropriate officers showing that it had been recorded with the public instruments of the notary who supervised the signing of the document. The terms of this power of attorney, so far as here relevant, are quoted above.

A few days later, on October 5th, Standard Cigar Company received a letter from the interventor, in which he stated that the Cuban revolutionary government was interested in maintaining its tobacco business with the United States, and then stated:

"Consequently, this intervention will receive with great pleasure your new orders to the firm of Tabacalera Severiano Jorge, S. A., Havana, Cuba; at the same time, we wish to advise you that your debt balance with this

2. This letter is as follows:
"Regarding the balance due to Tabacalera Severiano Jorge, S.A. for the last several shipments, it is requested that payment be made to me as agent for the company at Miami, Florida. I hold an unconditional and unqualified power of attorney authorizing me to collect moneys due to the company. I am enclosing herewith a copy. The power of attorney is

still in full force and effect, and I have been informed by counsel that I am authorized under the power of attorney to collect moneys due to the company for balances owed to it.

"I would appreciate it if you would send the balance of our account to Tabacalera Severiano Jorge, S.A. to my care.

"Very truly yours,
SEVERIANO JORGE."

firm is $100,894.28, which should be settled in due time by means of remittances directly to same, no person or entity whatsoever being authorized to effect collections in its name in your country."

The Standard Cigar Company having failed to make payment of the amount owing for the tobacco, demand was made on behalf of Tabacalera, acting through Jorge, by counsel, on October 12, 1960. This demand was based again on the "unconditional and unqualified power of attorney authorizing [Jorge] to collect moneys due to the company." No reply having been received to this demand, Tabacalera Severiano Jorge, S. A., the corporation, filed suit for the amount due on October 26, 1960. This suit was met with a motion to dismiss on the ground of *forum non conveniens*. Before acting on this motion, the district court directed that the defendant file its answer. Thereafter, and before the answer was filed, Jose Romano, vice president of the corporation, *and one of the joint holders of the power of attorney* above referred to, executed an assignment in the following terms:

## "ASSIGNMENT

"KNOW ALL MEN, that TABACALERA SEVERIANO JORGE, S. A., a Cuban corporation, in consideration of the sum of Ten Dollars ($10.00) to it in hand paid by SEVERIANO JORGE, S. A., a Cuban corporation, in consideration of the sum of Ten Dollars ($10.00) to it in hand paid by SEVERIANO JORGE, has sold, transferred and assigned and by these presents does sell, transfer and assign to the said SEVERIANO JORGE all of the said corporation's right, title, interest, claim and demand in and to certain accounts receivable and all sums due thereunder owing by the Antonio Company, a Florida corporation and Standard Cigar Co., a Florida corporation, and does hereby vest in the said Severiano Jorge full power and authority to sue for, collect and demand the payment of said sums.

"IN WITNESS WHEREOF, the said TABACALERA SEVERIANO JORGE, S. A. has caused these presents to be executed by its duly authorized officer this 1st day of April, 1961."

Thereafter, defendant filed its answer as required by the court, and as a "fourth defense" alleged affirmatively:

"On or about the 1st day of April, 1961, the plaintiff corporation assigned to Severiano Jorge, in writing, any right of action plaintiff had against the defendant, Standard Cigar Company. A true copy of said assignment, marked Exhibit I is hereto attached, and is made a part hereof by special reference as if set forth herein in haec verba."

It is of especial significance to note that in none of the subsequent pleadings has the defendant amended or modified its allegation that the plaintiff had "assigned to Severiano Jorge, in writing, any right of action plaintiff had against the defendant, Standard Cigar Company." In a subsequent defensive pleading, Standard contended that the assignment "or purported assignment" was invalid because not within the power of the corporation to execute.

The trial court then sustained the motion to dismiss for *forum non conveniens*. This judgment was reversed by this court. Standard filed its petition for certiorari to the United States Supreme Court, which then vacated our judgment in the following language:

"The petition for writ of certiorari is granted. The judgment is vacated and the case is remanded to the United States Court of Appeals for the Fifth Circuit for further consideration in light of Banco Nacionale de Cuba v. Sabbatino, 376 U.S. 398 [84 S.Ct. 923, 11 L.Ed.2d 804]."

Standard Cigar Co. v. Tabacalera Severiano Jorge, 376 U.S. 780, 84 S. Ct. 1131, 12 L.Ed.2d 82.

Upon receiving the Supreme Court mandate, we entered the following opinion:

"For the reasons given in per curiam opinion filed this date in Menendez Rodriquez v. Pan American Life Insurance Company, et al, 5 Cir., 340 F.2d 707 * * * this case is hereby remanded to the district court to afford the parties opportunity to be heard upon development of such record as is found necessary by the district court for its determination of the applicability of the Act of State Doctrine to this complaint."

The need for remanding the case to the district court arose because of the Supreme Court's direction to us that the case have further consideration in light of its decision in Banco Nacionale de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804.

It goes without saying that if the state of facts in the case before us is parallel to that in *Sabbatino*, then it would be necessary for the district court to dismiss the suit in the trial court because, otherwise, the courts would be doing violence to what is known as the "Act of State Doctrine."

Since the appellee's defense here, based solely upon its contention that the government of Cuba has, by laws suitable to its needs, acquired every right and interest which Tabacalera owned in this account receivable, is dependent upon the act of State Doctrine, we must at the outset consider what is meant by this legal principle.

■ The Supreme Court said in Banco Nacionale de Cuba v. Sabbatino:

"The classic American statement of the Act of State Doctrine, which appears to have taken root in England as early as 1674, Blad v. Bamfield, 3 Swans. 604, 36 English Reports 992, and began to emerge in the jurisprudence of this country in the late 18th and early 19th century * * * is found in Underhill v. Hernandez, 168 U.S. 250 [18 S.Ct. 83, 42 L.Ed. 456], where Chief Justice Fuller said for a unanimous court (page 252 [18 S.Ct. at p. 84]):

'Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of a government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.'"

The Court then said:

"None of this Court's subsequent cases in which the Act of State Doctrine was directly or peripherally involved manifest any retreat from Underhill. See American Banana Co. v. United Fruit Co., 213 U.S. 347 [29 S.Ct. 511, 53 L.Ed. 826]; Oetjen v. Central Leather Company, 246 U.S. 297 [38 S.Ct. 309, 62 L.Ed. 726]; Ricaud v. American Metal Co., 246 U.S. 304 [38 S.Ct. 312, 62 L.Ed. 733]; Shapleigh v. Mier, 299 U.S. 468 [57 S.Ct. 261, 81 L.Ed. 355]; United States v. Belmont, 301 U.S. 324 [57 S.Ct. 758, 81 L.Ed. 1134]; United States v. Pink, 315 U.S. 203 [62 S.Ct. 552, 86 L.Ed. 796]. On the contrary in two of these cases, Oetjen and Ricaud, the doctrine as announced in Underhill was reaffirmed in unequivocal terms." 376 U.S. 398, 416, 84 S.Ct. 934.

In the reconsideration we are required to make of the present case by the Supreme Court's mandate, we look first to see to what extent the facts are similar. Two points of dissimilarity are immediately apparent. The first need not be fully developed because it may really be a distinction without a difference if all of the facts were fully known, and because appellants need not rely upon this circumstance as a basis for the relief they seek here. This difference is that in the *Sabbatino* case the act of the Cuban government was a direct and open confiscation of the property of the Cuban-based sugar corporation, whereas in

the instant case, the act of the Cuban government amounted only to "in intervention" for the period of one year.[3]

The really important point of difference between the facts of this case and that of *Sabbatino* is that the subject of the confiscation in the latter case was a ship's cargo of sugar which was present in the territorial waters of Cuba—tangible personal property—whereas in the case before us the subject of the alleged "taking" by the government of Cuba is a credit owed to the Cuban corporation, (albeit arising out of a Cuban transaction) by an American creditor domiciled in Tampa, Florida.

To begin with, it goes without saying that if the effort by Severiano Jorge to obtain as assignee of Tabacalera money which was admittedly due and owing to the corporation depended upon either his physical self-help within the territory of Cuba or upon his showing that the courts of Cuba would hold in his favor, there would be no practical basis for his claim here, because it is clear that the Cuban government would physically prevent the former and would "judicially" foreclose any rights as to the latter. Such conduct by the Cuban government, while offensive to countries like the United States, operating under constitutional limitations of governmental power, would be beyond the power of this country to control because it would be conduct within Cuba. Thus, it would fall clearly within the Act of State Doctrine, for any effort to attack such conduct of the Cuban government would be in violation of the principle that the courts of the United States "will not sit in judgment on the acts of the government of another, *done within its own territory.*" (Emphasis added.) See Underhill v. Fernandez, supra.

The question then, naturally, arises whether the Act of State Doctrine prevents United States Courts from deciding a case as to which it has personal jurisdiction of the parties and the *res* merely because the government of a foreign state would, if it had the parties before it, as well as the *res,* decide it differently.

Thus, we come straight to the question whether the Act of State Doctrine requires that our courts reject a claim, otherwise cognizable by them, purely on the assumption that if all the parties and the thing in issue were present in Cuba the Cuban government would act in a manner most destructive of private property and most beneficial to itself as distinguished from its citizens.

We conclude that the Act of State Doctrine does not require such holding.

Here, even assuming that the Cuban government would, had it thought it necessary to do so, have expressly given to Senor Alvarez, its intervenor, specific authority to sue to collect outstanding accounts, *which it did not,* and that it would, if it had thought it necessary to do so, have expressly given to him the powers of attorney, *which it did not,* the significant power to cancel, terminate or rescind all outstanding powers of attorney, which it did not, the significant fact is that the intervenor did neither of these things. The only proof of the Cuban law that was before the trial court was in the deposition testimony of three Cuban lawyers, by whom it was made clear that the broad power of attorney executed by the corporation in favor of Jorge and Romano could be revoked only by a similar document filed in the same registry in which the power of attorney had been filed. Even though we were to assume, contrary to the available evidence, that the power of attorney could be revoked in Cuba by a less formal act,

---

**3.** It is argued in the *brief* of the appellee that somehow after the end of the year the Cuban government acquired some additional absolute power or rights as to the assets of Tabacalera, amounting in effect to confiscation. The record is void of any proof of what actually was the status of affairs, although we may feel fairly certain that the Cuban government has not affirmatively relinquished whatever rights it had to supplant the original directors and stockholders and officers of this corporation.

there is an utter lack of proof that the intervenor attempted to withdraw or revoke the power of attorney, probably since he knew nothing about it. The burden of proving such a revocation was, as a matter of defense, on the defendant below.

Thus, it is, that on the record before us, it stands undisputed that Jorge and Romano, as of the time they made demand on Standard Cigar Company had an outstanding, unconditional power of attorney which authorized them expressly to make the collection which they sought to make. This, of course, had been given to them long before the intervenor was appointed. Then, it also follows that even after the intervenor was appointed and went into possession of whatever was available to him to reach in Cuba, he had no authority to, and did not attempt, even then, to revoke the outstanding power of attorney. Thus it is, that on April 1, 1961, Romano had full power to execute the assignment of the corporation's claim to Jorge.[4]

■ We conclude, therefore, that an analysis of the acts of the Cuban government, giving absolutely complete and full effect to them, requires us to hold that through inadvertence, mistake or purposeful handling of this account, the Cuban government did not actually, by any of its official acts, interfere with the right of Tabacalera Severiano Jorge, S. A. to collect this account in the manner in which the company sought to pursue the remedy in the United States courts in Tampa. This would be true even if the credit here be deemed to have a "situs" in Cuba, or even if it be deemed to be in all material aspects the same as tangible property. Cf. Banco Nacionale de Cuba v. Sabbatino, supra. This is true because the government and the intervenor *on this record* failed to take the steps which might otherwise have divested Tabacalera and Jorge and Romano of the power to assign this claim. We see no reason to create a further power of confiscation in the intervenor than the government gave him.

Here, simply stated, there was no confiscation of the kind exercised by Cuba as to the sugar in *Sabbatino*. There was in effect a limited temporary receivership which did not attempt to cancel an outstanding power of attorney.

■ Moreover, we conclude that in light of the fact that the government of Cuba did not have physical control over the species of property represented by this claim against Standard Cigar Company, it would not be a violation of the Act of State Doctrine for the courts to hold that, had the Cuban government taken all of the steps that its unlimited power would have permitted it to take, such conduct by the Cuban government would not be recognized by the United States courts. Nothing in the *Sabbatino* case requires that the doctrine be extended thus far. It should be noted that in the *Sabbatino* case the *res* that was subject to confiscation by the Cuban government was physical property present in Cuba; whereas the *res* here is a credit owed by an American company in Tampa, Florida. Much is said by the appellees in this case undertaking to show that the situs of the debt owed by Standard Cigar to Tabacalera was in Havana, Cuba. The situs of intangible property is about as intangible a concept as is known to the law. The situs may be in one place for ad valorem tax purposes, Farmers Loan and Trust Co. v. State of Minnesota, 280 U.S. 204, 50 S.Ct. 98, 74 L.Ed. 371; it may be in another place for venue purposes, i. e.,

---

4. While Standard makes some effort to inquire as to what consideration flowed to the corporation in return for the assignment executed to Jorge, this is utterly irrelevant so far as Standard is concerned, for Standard has no concern about the management of the creditor corporation with which it is dealing. However, in order to make it appear that all the equities favored the granting of such assignment, even beyond the fact that all equitable ownership in the stock belonged to Jorge, the evidence is undisputed that Jorge himself had concurrently advanced to the corporation six times as much as he was suing for in expectation of being able to obtain a partial reimbursement by the collection of this claim.

garnishment, Chicago R. I. & P. R. Co. v. Sturm, 174 U.S. 710, 19 S.Ct. 797, 43 L.Ed. 1144; it may be in more than one place for tax purposes in certain circumstances, Curry v. McCanless, 307 U.S. 357, 59 S.Ct. 900, 83 L.Ed. 1339; it may be in still a different place when the need for establishing its true situs is to determine whether an overriding national concern, like the application of the Act of State Doctrine is involved.

The Supreme Court had determined in the *Sabbatino* case that in deciding the situs of a debt such as the one before us, as an ingredient in determining whether the governmental acts of Cuba withdraw it from the jurisdiction of American courts is a matter of federal law and not of state law. The Court said:

"However, we are constrained to make it clear that *an issue* concerned with a basic choice regarding the competence and function of the Judiciary and the National Executive in ordering our relationships with other members of the international community must be treated exclusively as an aspect of federal law." (Emphasis supplied.) 376 U.S. 398, 425, 84 S.Ct. 939.

Here, resolution of the issue of situs of the debt determines whether the Act of State Doctrine applies.

Therefore we must fashion a rule of federal law to determine whether in dealing with this particular species of intangible property the overriding concern of international relations of the United States and Cuba requires that we give effect to the confiscatory policies of the Cuban government to funds which are fully within the physical control of the American courts, and clearly without the physical control of the courts of the government of Cuba.

In doing so, we recognize that no such rule can be fashioned that will violate the principles enunciated by the Supreme Court in *Sabbatino*. We find that principle expressed in the following language:

"It is also evident that some aspects of international law touch more sharply on national nerves than do others;

the less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches. * * * Therefore, rather than laying down or reaffirming an inflexible and all encompassing rule in this case, we decide only that the judicial branch will not examine the validity of a taking of property *within its own territory* by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or unambiguous agreement regarding controlling legal principles, even if a complaint alleges that the taking violates customary international law." 376 U.S. 398, at 428, 84 S.Ct. at 940.

The underlying thought expressed in all of the cases touching on the Act of State Doctrine is a common-sense one. It is that when a foreign government performs an act of state which is an accomplished fact, that is when it has the parties and the *res* before it and acts in such a manner as to change the relationship between the parties touching the *res*, it would be an affront to such foreign government for courts of the United States to hold that such act was a nullity. Furthermore, it is plain that the decisions took into consideration the realization that in most situations there was nothing the United States courts could do about it in any event.

In the case before us, it cannot be doubted that whatever may be the ordinary concept of the situs of a debt, the government of Cuba was not physically in a position to perform a *fait accompli* in the nature of the acquisition by the Cuban government or its intervenor of the money owed to Tabacalera by Standard Cigar Company. It was simply not within the power of Cuba to accomplish this result. To this extent, we think it clear that whatever efforts were made by the Cuban government dealing with Tabacalera, these acts are to be recognized under the Act of State Doctrine only insofar as they were able to come to complete fruition within the dominion of

the Cuban government. As to other matters we conclude that they were not a "taking of property *within its own territory*" within the language used by the Supreme Court in *Sabbatino*.

The Supreme Court has fully recognized in its decisions over the years that the situs of intangible personal property is a shifting concept. The Court, in Curry v. McCanless, supra, fully discusses the varying concepts of situs of intangible personal property for tax purposes. 307 U.S. 357, at page 368, 59 S.Ct. at page 900.

Here, we do not have a case in which affected third parties are litigating over the accomplished fact of "takeover" of an asset in Cuba. We are dealing rather with a change in the form of the asset from an account receivable into cash, which can be accomplished only in the courts of the United States. In attempting to fashion a rule fixing the situs of an indebtedness for the very limited purpose of deciding whether it is "property *within [Cuba's] own territory*," we find no compelling requirement that we accept the fiction that the situs is irrevocably at the domicile of the creditor, a fiction sometimes used for other commercial purposes. For the purpose of our inquiry we find this debt was not property in Cuba.

■■ We conclude, therefore, that it was error for the trial court to dismiss the complaint by summary judgment. On the record before the trial court the appellants were entitled to have their motion for summary judgment granted. Such failure by the trial court is not, of course, appealable as such, because an order *denying* a motion for summary judgment is an interlocutory order in the case and not a final order. However, it appears that there is no material issue of any relevant fact under the law of the case as we conceive it to be. Both parties have had more than ample time to develop pleadings and fact issues and it now seems appropriate to direct that judgment be entered for the appellant Jorge as assignee of Tabacalera Severiano Jorge, S. A., a status which the defendant, by its pleadings, concedes he holds if the Act of State Doctrine does not control the case.

The judgment is reversed and the case is remanded to the district court with directions that judgment be entered in favor of Severiano Jorge.