UNITED BANK LIMITED,
Plaintiff-Appellee-Appellant,

v.

COSMIC INTERNATIONAL, INC.,
Defendant-Appellee,

JANATA BANK and Amin Jute Mills,
Ltd., Plaintiffs-Appellants,

v.

COSMIC INTERNATIONAL, INC. and
Irving Trust Company,
Defendants-Appellees.

SONALI BANK and Nishat Jute Mills,
Ltd., Plaintiffs-Appellants,

v.

IRVING TRUST COMPANY and Cosmic
International, Inc.,
Defendants-Appellees.

NISHAT JUTE MILLS, LTD. and
National Bank of Pakistan,
Plaintiffs-Appellees-Appellants,

v.

COSMIC INTERNATIONAL, INC.,
Defendant-Appellee.

Nos. 164 to 166, 170, Dockets 75–7287,
75–7320, 75–7325 and 75–7363.

United States Court of Appeals,
Second Circuit.

Argued Nov. 24, 1975.

Decided Sept. 30, 1976.

Jerome Lipper, New York City (Leon, Weill & Mahony, and Barry J. Bendes, New York City, of counsel), for plaintiffs-appellants Janata Bank, Amin Jute Mills, Ltd., Sonali Bank, and Nishat Jute Mills, Ltd.

Louis L. Stanton, Jr., New York City (Carter, Ledyard & Milburn, and Chester J. Wrobleski, New York City, of counsel), for plaintiff-appellee-appellant United Bank Limited.

Judith S. Kaye, New York City (Olwine, Connelly, Chase, O'Donnell & Weyher, and Stephen Schlessinger, New York City, of counsel), for plaintiffs-appellees-appellants National Bank of Pakistan and Nishat Jute Mills, Ltd.

John S. Rogers, New York City (Burlingham, Underwood & Lord, and Alexander S. Kritzalis, New York City, of counsel), for defendant-appellee Cosmic International, Inc.

Before MOORE and TIMBERS, Circuit Judges, and COFFRIN,* District Judge.

COFFRIN, District Judge:

This action involves a dispute between Bangladesh and Pakistani plaintiffs [1] concerning the right to receive payment for jute products which were exported from the former territory of East Pakistan and resold in the United States prior to December 16, 1971, the day that Bangladesh won its independence from Pakistan. The complicated factual circumstances surrounding this matter have already been well summarized by the District Court and are set out in the footnote below.[2] In essence, defend-

---

* Honorable Albert W. Coffrin of the United States District Court for the District of Vermont, sitting by designation.

1. Defendant Cosmic International, Inc. was originally sued by four sets of plaintiffs. With the consent of counsel, the four cases were tried jointly before the district court.

2. The following pertinent events and transactions were duly noted by the district court:

   A "Proclamation of Independence" was issued in India on April 10, 1971 declaring that East Pakistan became the sovereign state of Bangladesh on March 26, 1971. The revolution began in the Spring of 1971, but most of East Pakistan continued under the control of Pakistan until Pakistani troops surrendered on December 16, 1971.

   On February 28, 1972, the new government issued the "Bangladesh Abandoned Property (Control, Management and Disposal) Order, 1972", which decreed that all property owned by citizens of a state at war with Bangladesh after March 25, 1971 (i. e., Pakistan) was vested in the government of Bangladesh. There was no provision for compensation.

   On March 26, 1972, the "Bangladesh Banks (Nationalisation) Order, 1972" and the "Bangladesh Industrial Enterprises (Nationalisation) Order, 1972" declared all shares of banks and industrial companies which had not already vested in the government under any other law immediately vested in the government as sole shareholder. Compensation was limited to the paid-up value of the shares. No compensation has been paid pursuant to these orders.

   *Transactions Between Cosmic and Nishat*

   Nishat Jute Mills, Ltd., incorporated under the laws of Pakistan in 1955 ("Nishat"), oper-

ated a mill for the manufacture of jute products in East Pakistan until the mill was nationalized in 1972. A new government-owned enterprise, Bangladesh Jute Mills Corporation, took over ownership and management of the mill.

From 1967 through 1970, Cosmic sold jute carpet backing for Nishat as its exclusive sales agent in the United States and Canada. After September 1970, Cosmic purchased carpet backing pursuant to individual purchase orders. This action concerns shipments of jute carpet backing loaded aboard five vessels at Chittagong, East Pakistan, between July 23, 1971 and November 1, 1971. All of the goods, bills of lading and related documents arrived in the United States before December 16, 1971, and the merchandise was resold before that date. Between September 7, 1971 and December 3, 1971, Cosmic accepted drafts drawn on it by Nishat, obligating it to pay $97,043.50 for the five shipments. Payment was to be made in New York City between March and May, 1972, to Irving Trust Company, acting as agent for Nishat's bank, National Bank of Pakistan ("National Bank"). The money was to be credited to National Bank's head office in Karachi, Pakistan, with notice to its Dacca, East Pakistan branch office, the branch with which Nishat dealt.

At the time of these transactions, Nishat was indebted to National Bank in an amount exceeding $97,043.50. Had Cosmic paid National Bank, its Dacca office would have credited Nishat's account, reducing Nishat's indebtedness by the full amount received.

Because of the intervening events in East Pakistan and the conflicting claims of the Pakistani plaintiffs and the Bangladesh plain-

ant Cosmic International, Inc. ("Cosmic"), a Delaware corporation that at all times relevant to this action had its principal place of business in New York City, presently holds two funds amounting to $97,043.50 and $433,365.96 which represent the proceeds from the sale of the jute products in question. The jute was originally supplied in separate transactions by two of the Pakistani plaintiffs, Nishat Jute Mills, Ltd. ("Nishat") and Amin Jute Mills, Ltd. ("Amin"), both of whom are Pakistani corporations whose East Pakistani interests were expropriated without compensation by the Bangladesh government after the termination of hostilities. The National Bank of Pakistan ("National Bank") and the United Bank Limited ("United Bank"), whose assets in Bangladesh were similarly confiscated, financed the respective Nishat and Amin transactions. Since Nishat admits its liability to National Bank and Amin has already assigned its interest in this litigation to United Bank, the two financial institutions assert that they are entitled to the funds held by Cosmic. All of these claims are controverted by the Bangladesh plaintiffs who argue by virtue of two nationalization orders that they are successors in interest to all property formerly owned by the Pakistani plaintiffs. Although the Bangladesh plaintiffs acknowledge that no compensation was paid for any of the Pakistani property purportedly seized, they maintain that the act of state doctrine precludes American courts from examining the propriety of any taking effected by Bangladesh law.

■ The act of state doctrine, of course, is derived from the principle that "[e]very sovereign State is bound to respect the independence of every other sovereign State," and on this basis the Supreme Court has declared that "the courts of one country will not sit in judgment on the acts of the government of another *done within its own territory*." *Underhill v. Hernandez*, 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897) (emphasis added); *see Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 416, 428, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964).[3]

tiffs, Cosmic did not make payment, although it admits the debt.

*Transactions Between Cosmic and Amin*

Amin Jute Mills, Ltd. ("Amin") was incorporated under the laws of Pakistan in 1953. It had a branch office in Karachi, Pakistan, with its principal office and its only jute mill in Chittagong, East Pakistan. All shares of stock and property of Amin located in East Pakistan when the new government came into power are now vested in Bangladesh Jute Mills Corporation.

This action concerns jute and hessian cloth purchased by Cosmic from Amin for a total of $433,365.96. The goods, bills of lading and related documents arrived in the United States before December 16, 1971, and the shipments were resold by Cosmic before that date.

Irving Trust Company, acting as Trustee pursuant to seven Trust Receipts dated August 11, 1971 through December 3, 1971, was to collect the purchase price in New York City and remit it to the Karachi, Pakistan, office of United Bank Limited ("United Bank"), and notify United Bank's branch at Chittagong, East Pakistan, the branch with which Amin dealt.

At the time of these transactions, Amin was indebted to United Bank in an amount in excess of $433,365.96. According to the agreement between United Bank and Amin, these funds could be paid over to Amin or used to reduce Amin's indebtedness to the Bank, as the Bank chose.

Cosmic was to make payment to Irving Trust Company between February and June, 1972. Again, because of the events in East Pakistan and the claims being made by the respective plaintiffs, Cosmic did not pay, but admits the debt.

392 F.Supp. 262, at 264–265 (footnotes omitted).

3. The Supreme Court has indicated that the doctrine is fundamentally grounded upon a common sense rationale:

The principle . . . rests at last upon the highest considerations of international comity and expediency. To permit the validity of the acts of one sovereign State to be reexamined and perhaps condemned by the courts of another would very certainly "imperil the amicable relations between governments and vex the peace of nations."

*Oetjen v. Central Leather Co.*, 246 U.S. 297, 303–04, 38 S.Ct. 309, 311, 62 L.Ed. 726 (1918). Moreover, the Court has acknowledged that, at least in part, the principle does have constitutional roots:

It arises out of the basic relationships between branches of government in a system of

The district court below, however, relying upon this Court's decision in *Menendez v. Saks and Company*, 485 F.2d 1355 (2d Cir. 1973), *rev'd on other grounds sub nom., Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976), and *Republic of Iraq v. First National City Bank*, 353 F.2d 47 (2d Cir. 1965), *cert. denied*, 382 U.S. 1027, 86 S.Ct. 648, 15 L.Ed.2d 540 (1966), held that the act of state doctrine does not govern this case because at the time the Bangladesh government attempted to seize these debts their situs was in New York. 392 F.Supp. at 265. Once this doctrinal obstacle was removed, the district court refused to give effect to the purported confiscations because they were contrary to American public policy. *Id.*, at 266–67. Accordingly, judgment was entered in favor of the Pakistani plaintiffs. National Bank and United Bank were allowed to recover $97,043.50 and $433,365.96 respectively plus interest at six percent from the earliest dates their particular suits were filed.[4] On appeal, the Bangladesh plaintiffs argue *inter alia* that the situs of these debts is actually within Bangladesh, and that, in any event, the confiscations were consistent with American practice in the context of a wartime situation. In addition, National Bank and United Bank appeal that portion of the district court's order which failed to award them prejudgment interest from the date the debts became due. For the reasons stated, we affirm the district court's analysis of the act of state doctrine, but remand for modification of its order pertaining to prejudgment interest in accordance with this opinion.

separation of powers. It concerns the competency of dissimilar institutions to make and implement particular kinds of decisions in the area of international relations. The doctrine as formulated in past decisions expresses the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole in the international sphere.

*Extraterritorial Seizures and the Act of State Doctrine*

█ In *Republic of Iraq*, this Court noted that the act of state doctrine has territorial limitations:

Under the traditional application of the act of state doctrine, the principle of judicial refusal of examination applies only to a taking by a foreign sovereign of property within its own territory, see Ehrenzweig, Conflict of Laws § 48 at 172 (1962); cf. *Banco Nacional de Cuba v. Sabbatino, supra*, 376 U.S. at 401, 428, 432, 84 S.Ct. 923, [11 L.Ed.2d 804]; when property confiscated is within the United States at the time of the attempted confiscation, our courts will give effect to acts of state "only if they are consistent with the policy and law of the United States." Restatement [of Foreign Relations Law (Proposed Official Draft, 1962)] § 46.

353 F.2d at 51. This principle was applied in *Menendez* to a factual situation remarkably similar to the one at hand. There, the former owners of Cuban cigar manufacturing enterprises were embroiled in a controversy with Cuban "interventors"[5] over the right to receive payment for preintervention (i. e. preseizure) debts owed by importers situated in the United States. Rather than allow the Cuban seizures to be shielded from judicial review by applying the act of state doctrine, this Court acted consistently with its decision in *Republic of Iraq*:

Application of the principles of . . . [*Republic of Iraq*] here satisfies us that since the owners' accounts receivable had their situs in the United States rather than in Cuba at the time of intervention and since the Cuban government's pur-

4. *See* note 1, *supra*.

5. The expression "intervenor" is a euphemistic term used to describe agents of the Cuban government who have been put in charge of operating businesses which have been nationalized by the state. *See Menendez v. Saks and Company, supra*, 485 F.2d at 1360, n. 1.

ported seizure of them without compensation is contrary to our own domestic policy, the act of state doctrine does not apply, the confiscation was ineffective, and the interventors' claim must be rejected. The owners rather than the interventors therefore remain entitled to collect these accounts.

Menendez v. Saks and Company, supra, 485 F.2d at 1364.[6] This position is supported by other authority, see Banco Nacional de Cuba v. Sabbatino, supra, 376 U.S. at 428, 84 S.Ct. 923 (by implication); Maltina Corp. v. Cawy Bottling Co., 462 F.2d 1021, 1025 (5th Cir. 1972), cert. denied, 409 U.S. 1060, 93 S.Ct. 555, 34 L.Ed.2d 512 (1972); Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena, 293 F.Supp. 892, 910–11 (S.D.N.Y.1968), modified on other grounds, 433 F.2d 686, 703 (2d Cir. 1970), cert. denied, 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971), and is ultimately dispositive of the issues in this case. Since the district court was not obliged to apply the act of state doctrine to extraterritorial seizures, the Bangladesh decrees were properly denied effect because American public policy "does not recognize the validity of governmental takings without compensation." 392 F.Supp. at 267; see Banco Nacional de Cuba v. Sabbatino, supra, 376 U.S. at 436–37, 84 S.Ct. 923; Republic of Iraq v. First National City Bank, supra, 353 F.2d at 51–52.[7]

The Bangladesh plaintiffs, however, maintain that the act of state doctrine should govern this controversy because the decrees in question, while admittedly confiscatory, were not of an extraterritorial nature. Three arguments are offered in support of the position that these debts had their situs within Bangladesh: (1) Cosmic's creditors are said to be located there; (2) the Bangladesh courts are alleged to have jurisdiction over the debtor; and (3) the Cosmic debt secured the indebtedness of the jute mills to the banks, and since these latter debts were located in Bangladesh at the time of the seizure, Cosmic's obligation passed as an incident of that taking. All of these contentions are plainly lacking in merit.

The first proposition advanced by the Bangladesh plaintiffs was directly refuted by this Court in Menendez. There it was indicated that "[f]or purposes of the act of state doctrine, a debt is not 'located' within a foreign state unless the state has the power to enforce or collect it." Menendez v. Saks and Company, supra, 485 F.2d at 1364. On this basis, the Menendez opinion proceeded to distinguish two Supreme Court decisions which treated the debt as situated in the creditor's domicile for tax and escheat purposes:

Those cases, however, had nothing to do with the power to enforce payment of a debt, which was the basis of our decision in Republic of Iraq and which generally depends on jurisdiction over the person of the debtor. See Harris v. Balk, 198 U.S. 215, 25 S.Ct. 625, 49 L.Ed. 1023 (1904). Rather the Supreme Court's concern in those cases was to establish principles of comity which would avoid the odious possibility of double taxation or double liability. In both cases the Court recog-

---

**6.** On appeal the Supreme Court denied the interventors' petition for certiorari insofar as this portion of the Menendez decision was concerned. Alfred Dunhill of London, Inc. v. Republic of Cuba, supra, 425 U.S. at 690, 96 S.Ct. at 1859, n.6.

**7.** Alternatively, it is possible that this case might have been resolved on a more narrow basis simply by holding that since the debts were not in Bangladesh at the time of the taking, the seizure did not reach them. See Alfred Dunhill of London, Inc. v. Republic of Cuba, supra, 425 U.S. at 691, 96 S.Ct. at 1860, n.8; Tahacalera Severiano Jorge, S.A. v. Standard Cigar Co., 392 F.2d 706, 714–716 (5th Cir.

1968), cert. denied, 393 U.S. 924, 89 S.Ct. 255, 21 L.Ed.2d 260 (1968); see also Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena, supra, 293 F.Supp. at 910–912; Restatement of the Foreign Relations Law of the United States § 41, comment i, at 130–131. However, primarily because of its sophistication, it would seem that the more traditional approach employed by the district court is to be preferred, since whether foreign decrees purporting to have extraterritorial effect should be given recognition in the United States is a determination which should not be made without considering questions of international comity and American public policy.

nized the difficulty of applying to intangible obligations, which "have no actual territorial situs," the general rule permitting states to tax or escheat only that property found within its territory and concluded that for such purposes intangible obligations would be "treated" as if localized at the creditor's domicile. The policy which underlay the Court's situs determination for purposes of enforcing tax or escheat claims has no relevancy or application to claims based upon a foreign government's purported confiscation.

*Id.*, at 1365. Similarly, the Fifth Circuit, while acknowledging that "[t]he situs of intangible property is about as intangible a concept as is known to the law," *Tabacalera Severiano Jorge, S.A. v. Standard Cigar Co., supra,* 392 F.2d at 714, has suggested that the underlying rationale of the act of state doctrine should be considered when determining situs in a situation involving a purported extraterritorial seizure. *Id.*, at 714–15. Thus, recognizing that the act of state doctrine reflects at least in part the realization that in most cases there is nothing that an American court can do to rectify a foreign seizure which has been fully effected within the territory of the expropriating state, the *Tabacalera* court declined to accept the creditor's domicile as the situs of a debt in a situation where the expropriating government "was not physically in a position to perform *fait accompli* . . . ." over the debt in question. *Id.*, at 715. In the absence of any new arguments which would compel a different approach in this case, we decline to modify the conclusions reached by the *Menendez* Court in this regard.

██ Next, the Bangladesh plaintiffs argue that if situs cannot be fixed in Bangladesh on the basis of a "creditor's domicile" theory, this result is nevertheless mandated on jurisdictional grounds. In support of this position they rely principally on the following dictum from the *Menendez* opinion:

In the absence of any showing that the importers or their agents were present in Cuba or subject to the jurisdiction of Cuban courts at the time of the intervention, we are persuaded by the reasoning of *Republic of Iraq* that no legal effect should be accorded to Cuba's purported confiscation of the importers' debts to the owners.

*Menendez v. Saks and Company, supra,* 485 F.2d at 1365. The district court, however, quite properly indicated that isolated statements such as the one quoted above were not "intended to overturn a rule firmly embedded in American jurisprudence at least since *Harris v. Balk,* 198 U.S. 215, 25 S.Ct. 625, 49 L.Ed. 1023 (1904)." 392 F.Supp. at 269. Significantly, the Bangladesh plaintiffs have not called our attention to any cases which actually applied jurisdictional considerations in fixing situs at a place other than the debtor's domicile. Moreover, since jurisdictional determinations would inevitably require American courts to engage in complex interpretations of foreign statutory and case law pertaining to jurisdiction, resolving situs questions on such a basis would deprive the act of state doctrine of certainty and predictability.[8] *Cf. Banco Nacional de Cuba v. Sabbatino, supra,* 376 U.S. at 424–428, 84 S.Ct. 923. An even more fundamental reason for declining to adopt this approach is that the act of state doctrine would thereby be given needless scope. Where an act of state has not "come to complete fruition within the dominion of . . . [a foreign] government," *Tabacalera Severiano Jorge, S.A. v. Standard Cigar Co., supra,* 392 F.2d at 715–16, no *fait accompli* has occurred which would otherwise effectively prevent an American court from reviewing the act's validity. More importantly, in the absence of such a *fait accompli,* there is less likelihood that any ensuing judicial review would jeopardize this country's foreign relations:

This emphasis on the completion of the Act of State squares with the policy con-

---

8. The present case exemplifies this problem. Both the Bangladesh and Pakistani plaintiffs have briefed the question of jurisdiction, and referred this Court to a considerable array of foreign law. Moreover, as the textual discussion *infra* perhaps suggests, conclusive determinations regarding this issue can rarely be made.

siderations articulated in the *Sabbatino* decision. The doctrine has "constitutional underpinnings", and its vitality "depends on its capacity to reflect the proper distribution of functions between the judicial and political branches of the Government in matters bearing on foreign affairs." *Sabbatino, supra,* 376 U.S. at 427, 84 S.Ct. at 940, 11 L.Ed.2d at 823. The obvious inability of a foreign state to complete an expropriation of property beyond its borders reduces the foreign state's expectations of dominion over that property; "the concept of territorial sovereignty is . . . deep seated. . ." *Sabbatino, supra,* 376 U.S. at 431–432, 84 S.Ct. at 942. Consequently, the potential for offense to the foreign state is reduced, there is less danger that judicial disposition of the property will "vex the peace of nations," and there is less need for judicial deference to the foreign affairs competence of the other branches of government. See Note, 1966 Duke L.J. 828, 833.

*Maltina Corp. v. Cawy Bottling Co., supra,* 462 F.2d at 1028–29.

Finally, *assuming arguendo* that jurisdictional factors should be considered for situs determination purposes, whether Cosmic would actually be subject to the jurisdiction of Bangladesh courts under the circumstances of this case is purely a speculative matter. For whatever reason, it is clear that the Bangladesh plaintiffs have not attempted this route. At trial, considerable attention was devoted to the question of whether section 20(c) of the Bangladesh Code of Civil Procedure[9] would permit a foreign corporation to be sued in a place

where the whole or part of a cause of action arises if the company does not have any office within that jurisdiction. However, "[a]s might be expected in any case of this nature, the legal experts are divided according to their political loyalties." 392 F.Supp. at 269. Since the Supreme Court of Pakistan, well before the initiation of the Bangladesh revolution, expressly declined to decide this question, *Rahmania Trading Co. v. Eagle Star Insurance Co.,* PLD 1960 Supreme Court (Pak.) 202, 204,[10] there is no definitive basis for an American court to resolve this issue at this time.

■ The Bangladesh plaintiffs' last argument pertaining to situs also goes well beyond the intended scope of the act of state doctrine. In essence, the Bangladesh plaintiffs maintain that the Cosmic debts have their situs in Bangladesh because they are actually security for previous debts (owed by the mills to the banks) which have their situs in Bangladesh. This argument, however, assumes a proposition which is unsupported by the record—that the debts were owed by the mills themselves rather than by their respective corporate entities—and, therefore, has no application insofar as Nishat's debt is concerned because Nishat has always maintained its head office and registered office in Karachi, Pakistan. As such, though its only mill was located in East Pakistan, Nishat's debt was located in Karachi and accordingly was not subject to seizure by Bangladesh. Although the same cannot be said with regard to Amin, which had its registered office and only mill in East Pakistan, there is an even more fundamental objection to the theory proposed by the Bangladesh plaintiffs.

**9.** Section 20 of the Bangladesh Code of Civil Procedure provides as follows:

Subject to the limitations aforesaid, every suit shall be instituted in a Court within the local limits of whose jurisdiction—
(a) the defendant, or each of the defendants where there are more than one, at the time of the commencement of the suit, actually and voluntarily resides, or carries on business, or personally works for gain; or
(b) any of the defendants, where there are more than one, at the time of the commencement of the suit, actually and voluntarily

resides, or carries on business, or personally works for gain, provided that in such case either the leave of the Court is given, or the defendants who do not reside, or carry on business, or personally work for gain, as aforesaid, acquiesce in such institution; or
(c) the cause of action, wholly or in part, arises.

**10.** Section 20 of the Bangladesh Code of Civil Procedure is identical with its counterpart in the Pakistani Code.

Because of territorial constraints and our country's traditional policy against confiscatory expropriations, the Bangladesh plaintiffs obviously would not have been able to seize directly the Cosmic debts located in New York. If the argument they now advance were to prevail, the Bangladesh plaintiffs would effectively be allowed to accomplish in an indirect manner a result which they could not have achieved directly. The act of state doctrine was not intended to permit foreign governments to circumvent American public policy. For this reason, our courts have always been wary of inadvertently extending extraterritorial effect to foreign seizures. Thus, in *Zwack v. Kraus Bros. & Co.*, 237 F.2d 255 (1956), this Court permitted members of a Hungarian business entity which had been confiscated to sue for outstanding debts and trademark infringement despite the defendant's objection that plaintiffs lacked standing because their ownership interests in the firm had previously been confiscated within the seizing country:

> We think that, where firm assets existing in the forum are concerned, technical considerations as to the manner in which the foreign state seeks to expropriate them are not controlling. Prior to confiscation the assets of the firm both here and in Hungary were equitably owned by the plaintiffs as the sole partners in the firm. It is clear that the Hungarian government could not directly seize the assets which have a situs in the state of the forum. To allow it to do so indirectly through confiscation of firm ownership would be to give its decree extraterritorial effect and thereby emasculate the public policy of the forum against confiscation. This we decline to do.

*Id.,* at 259. Similarly, the Fifth Circuit has indicated that extraterritorial seizures are to be viewed from a practical standpoint:

> *Tabacalera* and its predecessors teach that the federal courts are to take a pragmatic view of what constitutes an extraterritorial action by a foreign state. A foreign dissolution, if effective to destroy the "existence" of a foreign corporation and its claims to ownership of property in the United States, would allow the foreign sovereign to control (at least in a negative way) the disposition of valuable assets within the United States.

*Maltina Corp. v. Cawy Bottling Co., supra,* 462 F.2d at 1027.

The Bangladesh plaintiffs have offered us no persuasive reasons for departing from the sound policy reflected in the above observations. Their reference to *Dougherty v. Equitable Life Assurance Society,* 266 N.Y. 71, 193 N.E. 897 (1934), which held that a Russian decree that cancelled life insurance contracts precluded plaintiffs from recovering from the defendant insurer in the United States even though the insurance contracts expressly made the defendant's assets outside of Russian security for the indebtedness, is unavailing since the New York Court of Appeals' decision was expressly based on the language of the particular contracts involved which specifically stated that Russian law was to govern their operation. *Id.,* at 899–903. *Compare Pan-American Life Insurance Co. v. Blanco,* 362 F.2d 167 (5th Cir. 1966). Therefore, since the Bangladesh plaintiffs' argument would, if accepted, undermine American public policy against confiscatory takings, we decline to hold that the Cosmic funds are simply security which passed as incidents to any debts that may have been seized by Bangladesh within its own borders.

■ The Bangladesh plaintiffs' final argument is that, even if the situs of these debts is in New York, the seizures in question were consistent with established American standards which permit confiscatory taking in wartime situations. Admittedly, there is considerable case law which would support the principle that "[t]here is no constitutional prohibition against confiscation of enemy properties." *United States v. Chemical Foundation, Inc.,* 272 U.S. 1, 11, 47 S.Ct. 1, 5, 71 L.Ed. 131 (1926); *see, Stoehr v. Wallace,* 255 U.S. 239, 242–245, 41 S.Ct. 293, 65 L.Ed. 604 (1921); *Miller v. United States,* 78 U.S. [11 Wall.] 268, 304–05, 20 L.Ed. 135 (1870); *Brown v. United States,* 12 U.S. [8 Cranch] 109, 122, 3 L.Ed.

504 (1814). Indeed, the Trading with the Enemy Act, 50 U.S.C.App. §§ 1 *et seq.*, which gives the President of the United States authority to employ confiscatory measures, has long been considered to be an exercise of Congressional war-making power under the Constitution. U.S.Const. Art. I, § 8, cl. 11; *see, e. g. Stoehr v. Wallace, supra,* 255 U.S. at 242, 41 S.Ct. 293. However, neither this legislation nor any of the cases we have reviewed suggest even remotely that confiscatory seizures of an extraterritorial nature can ever be *consistent* with American public policy.[11]

■ It would hardly be "consistent" with American public policy to create a special exception for extraterritorial seizures committed in wartime. Aside from the antagonistic effect which such an exception would inevitably have on our foreign relations with previously friendly nations, this Court has already recognized that citizens of friendly sovereigns have a legitimate expectation that their property interests in the United States will receive the benefit of any protection our law affords:

It is true that since . . . [the fifth and fourteenth amendments] are addressed to action by the United States or a state, they might not prevent a court of the United States from giving effect to a confiscatory act of a foreign state with respect to property in the United States. But at least they show that, from its earliest days under the Constitution, this

nation has had scant liking for legislative proscription of members of a defeated faction, although—or perhaps because—many states, in their dealings with property of the loyalists immediately after the Revolution, had practiced exactly that. See *United States v. Brown,* supra, 381 U.S. [437] at 441–446, 85 S.Ct. 1707 [14 L.Ed.2d 484]. *Foreigners entrusting their property to custodians in this country are entitled to expect this historic policy to be followed save when the weightiest reasons call for a departure.*

*Republic of Iraq v. First National City Bank, supra,* 353 F.2d at 52 (emphasis added). Since the circumstances of this case do not warrant departing from this policy, the district court's holding with regard to the act of state doctrine is affirmed in all respects.[12]

### *Prejudgment Interest*

■ The successful Pakistani plaintiffs argue that the district court's failure to award prejudgment interest from the date that their respective cause of action accrued was contrary to New York law. Since this is a diversity action, New York CPLR § 5001 controls the date from which interest is to be computed. *See, e. g., Spector v. Mermelstein,* 485 F.2d 474, 481 (2d Cir. 1973); *St. Clair v. Eastern Air Lines, Inc.,* 302 F.2d 477, 480 (2d Cir. 1962). This section provides, in relevant part, as follows:

11. For example, the Trading with the Enemy Act speaks in terms of "property, subject to the jurisdiction of the United States" and "property *in* the United States." 50 U.S.C.App. §§ 5(b), 6 (emphasis added).

12. The Bangladesh plaintiffs have also argued that, even if the act of state doctrine is not applied, the extraterritorial seizures should be upheld because the law of Pakistan also sanctions the taking of property without payment of compensation. This position, however, completely ignores the express language of Article 24 of the Constitution of Pakistan which provides in relevant part as follows:

24. (1) No person shall be deprived of his property save in accordance with law.

(2) No property shall be compulsorily acquired or taken possession of, save for public purpose, *and save by the authority of law*

which provides for compensation therefor and either fixes the amount of compensation or specifies the principles on and the manner in which the compensation is to be determined and given.

\* \* \* \* \* \*

(4) The adequacy or otherwise of any compensation provided for by any such law as is referred to in this Article, or determined in pursuance thereof, shall not be called in question in any court.

(emphasis added). The qualification admittedly contained in section 4 is quite different from the Bangladesh Constitution which specifically provides "for the acquisition, nationalization, or requisition [of property] with *or without* compensation . . ." Article 42 of the Constitution of the People's Republic of Bangladesh (emphasis added).

§ 5001. *Interest to verdict, report or decision*

    (a) *Actions in which recoverable.* Interest *shall* be recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property, *except* that in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion.

    (b) *Date from which computed.* Interest shall be computed from *the earliest ascertainable date the cause of action existed*, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date.

N.Y. CPLR § 5001 (McKinney 1963) (emphasis added).

    ■ This Court has repeatedly held that since CPLR § 5001 is obviously phrased in mandatory terms, New York law does not permit the trial court to exercise any discretion with regard to prejudgment interest determinations. *Menendez v. Saks and Company, supra,* 485 F.2d at 1374; *Spector v. Mermelstein, supra,* 485 F.2d at 482; *Julien J. Studley, Inc. v. Gulf Oil Corp.,* 425 F.2d 947, 950 (2d Cir. 1969). Appellee Cosmic, however, maintains that there is room for the exercise of judicial discretion in this particular case because § 5001 specifically excepts "action[s] of an equitable nature" from the provision's mandatory scope. According to Cosmic, the "equity" exception to § 5001 is triggered in this instance because this case is basically an interpleader action, and, as such, is of an equitable nature. Although interpleader actions are, in fact,

commonly considered to be of an equitable nature, *see* D. Dobbs, Remedies § 2.12 (1973), and the trial judge below expressly characterized this litigation as "in the nature of an interpleader action," 392 F.Supp. at 263, Cosmic's argument reflects an unsuccessful attempt to place form over substance.

    This Court has previously stated that "[t]he policy of . . . section [5001] is to facilitate the award of interest and, . . . [that] 'the equity clause should not become a source of sterile controversy over the classification of causes of action.'" *Spector v. Mermelstein, supra,* 485 F.2d at 482. Regardless of how this case was characterized below, the decision in *Menendez* is dispositive of Cosmic's argument. That case could also have been characterized as "in the nature of an interpleader action" since it involved conflicting claims between former owners of Cuban cigar manufacturing plants and Cuban interventors [13] concerning the right to funds held by American importers. On appeal, the mandatory language of § 5001 was relied upon by this Court in rejecting the importers' contention that an award of prejudgment interest [14] "on the amounts due for post-intervention shipments" was inequitable in a situation where the importers had not been able "to obtain jurisdiction over the interventors *or to interplead* until . . . the latter intervened in the owners' action against the importers . . . ." *Menendez v. Saks and Company, supra,* 485 F.2d at 1374 (emphasis added). Rather than engage in an examination of whether the present case even qualifies for consideration as an interpleader within the meaning of 28 U.S.C. §§ 1335, 2361 and Rule 22 of the Federal Rules of Civil Procedure, we prefer simply to follow the *Menendez* opinion, and rest our decision on the basis of the compelling factual parallels which can be drawn between that case and this one.

---

13. *See* note 5 and accompanying text, *supra.*

14. In that case, the district court's award of prejudgment interest was to be computed from the filing of an earlier suit rather than from the

date the cause of action accrued. *Menendez v. Saks and Company, supra,* 485 F.2d at 1374. Apparently, this issue was not raised by the successful plaintiffs on appeal.

Accordingly, that portion of the district court's decision dealing with prejudgment interest should be modified as follows: National Bank and United Bank are entitled to prejudgment interest from the date that their causes of action accrued. The applicable rate of interest from the date payment became due is 7½ percent per annum until August 31, 1972 and 6 percent per annum for the period thereafter. *See Chris-Craft Industries, Inc. v. Piper Aircraft Corp.*, 516 F.2d 172, 191 (2d Cir. 1975), *cert. granted*, 425 U.S. 910, 96 S.Ct. 1505, 47 L.Ed.2d 760 (1976); *Kaufman v. Chase Manhattan Bank, National Association*, 370 F.Supp. 279, 280–281 (S.D.N.Y.1974); N.Y. CPLR § 5004 (McKinney Supp. 1975).

For the foregoing reasons, the judgment of the district court in favor of the National Bank of Pakistan and United Bank Limited is affirmed. However, we remand the case to the district court for modification of its prejudgment interest award in accordance with this opinion. In this regard, it will be necessary for the trial judge to make a determination as to the dates that these causes of action accrued.