884 F.2d 675
 9 UCC Rep.Serv.2d 817
 SEPTEMBERTIDE PUBLISHING, B.V., Plaintiff-Appellee, Cross-Appellant,
v.
STEIN AND DAY, INC. and New American Library, Defendant-Appellee,
Bookcrafters U.S.A., Inc., Counter-Claim
Defendant-Appellant, Cross-Appellee.
 Nos. 401, 604, Dockets 88-7664, 88-7694.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 6, 1988.
Decided Sept. 1, 1989.
 
 William Perry, New York City (Charles K. O'Neill, Charles F. Lacina, Chadbourne & Parke, New York City, of counsel), for counter-claim defendant-appellant, cross-appellee Bookcrafters.
 Marcia B. Paul, New York City (J. Jared Snyder, Kay Collyer & Boose, New York City, of counsel), for plaintiff-appellee, cross-appellant Septembertide Pub.
 Roger L. Zissu, New York City (Shira Perlmutter, Cowan, Liebowitz & Latman, New York City, of counsel), for defendant-appellee New American Library.
 Before OAKES, Chief Judge, and LUMBARD and CARDAMONE, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 On this appeal from the United States District Court for the Southern District of New York, Richard Owen, Judge, we are required to resolve a difficult and close question involving third-party beneficiary and commercial law principles which in this case suggest different results. The author and a trade creditor each claim to be entitled to the proceeds flowing from the paperback publication of a novel. The author, an intended third-party beneficiary, claims superior rights to the funds because so often a writer has all his or her financial eggs in one basket. The secured creditor asserts that as a financier of the commercial side of publishing, it should be accorded all those rights to which a secured creditor is entitled. Yet, the resolution of this question does not rest entirely on the parties' rights, but rather on which of them has priority. The issue for us is to determine, and properly observe, priority to the disputed proceeds between the claimant parties.
 
 FACTS AND PROCEEDINGS BELOW
 
 2
 Septembertide Publishing, B.V. (Septembertide or author), a corporation organized and existing under the laws of the Netherlands, is owned and controlled by one Harry Patterson, a resident of the Isle of Jersey in the Channel Islands, which are a part of the United Kingdom. S & L Enterprises (S & L), Septembertide's predecessor-in-interest, also is owned by Patterson who is the author of numerous literary works, usually under pseudonyms. He wrote the novel "Confessional" (the Work) under the pseudonym "Jack Higgins." The rights to the funds derived from the paperback edition of "Confessional" is the subject of the instant litigation.
 
 
 3
 S & L granted exclusive licensing rights to Stein & Day, a publishing house incorporated in New York with headquarters in New York City, to publish a hardcover edition of the Work in the United States. These rights were embodied in a written contract dated December 12, 1984 (Hardcover Agreement). In October 1985 Septembertide took over as successor-in-interest to S & L's rights in that contract. Under the contract's terms Stein & Day was obligated to pay an advance against future royalties of $375,000 in three equal installments of $125,000. Stein & Day was also obliged to account semi-annually, to pay royalties, and to pay its share of sublicensing income, after recouping its advances. With respect to the sublicensing income, these proceeds "from the sale or license of reprint rights" in media other than hardcover publication were to be divided two-thirds to the author Septembertide, and one-third to the publisher, Stein & Day. The first two advances were made, but the third one, due on January 15, 1986, was not paid. As of December 31, 1985 Stein & Day owed Septembertide $152,030.31. Stein & Day subsequently became insolvent and, though acknowledging its debt, was unable to make payments to Septembertide.
 
 
 4
 At the same time (actually one day earlier, December 11, 1984) that it entered into the Hardcover Agreement with Septembertide, Stein & Day entered into a contract with New American Library (New Library), giving New Library the rights to publish the paperback edition of "Confessional" (Paperback Agreement). New Library agreed to advance Stein & Day $750,000 in five installments, of which, prior to the institution of this suit on July 14, 1986, Stein & Day had received $385,500. Meanwhile, on November 20, 1985 Stein & Day had entered into a security agreement with Bookcrafters U.S.A., Inc. (Bookcrafters), assigning all its contract rights and accounts to Bookcrafters, including the paperback rights it had with New Library. Bookcrafters' search of UCC filings uncovered no evidence of Septembertide's interest in payments from New Library to Stein & Day. In a March 6, 1986 letter Septembertide terminated Stein & Day's rights in the Hardcover Agreement because the final $125,000 payment due in January had not been made. Septembertide then requested in May 1986 that New Library--as a result of Stein & Day recouping its advances--forward directly to it all future payments due Stein & Day under the Paperback Agreement. When New Library refused, Septembertide initiated this lawsuit against Stein & Day and New Library.
 
 
 5
 Septembertide's suit sought: (1) damages of $125,000 against Stein & Day plus interest for breach of contract; (2) a declaratory judgment that Stein & Day's rights under its contract with Septembertide have been terminated and ordering all those who take any interest through Stein & Day to pay all advances due or to become due directly to Septembertide; (3) an injunction against New Library due to its alleged anticipatory breach, compelling direct payment to Septembertide of all amounts due under the Paperback Agreement or, in the alternative, damages of $364,500 plus interest; and (4) two-thirds of the proceeds of the remaining payments of the Paperback Agreement as a third-party beneficiary to that Agreement, if it was determined that the Hardcover Agreement had not been terminated.
 
 
 6
 Bookcrafters then intervened, alleging that it had prior and superior right to the proceeds of the Paperback Agreement by virtue of its security agreement with Stein & Day. New Library was then faced with a situation in which several parties had laid claim to monies it concededly owed. It filed an interpleader by way of counterclaim naming all claimants--Stein & Day, Bookcrafters and Septembertide--and asked the court to determine the proper allocation of the funds it held. The monies were deposited into court sometime in December of 1987 by court order.
 
 
 7
 In an order and opinion dated October 7, 1987 Judge Owen stayed Septembertide's claim for the missing final $125,000 payment because of Stein & Day's bankruptcy. The district court denied Septembertide's claims that the Hardcover Agreement had been terminated by Stein & Day's failure to pay, and that New Library had anticipatorily breached its obligation under the Paperback Agreement. It held Septembertide to be a third-party beneficiary of the Paperback Agreement between Stein & Day and New Library. As such, the district court ruled that Septembertide's rights to two-thirds of New Library payments under that agreement were superior to Bookcrafters' secured creditor rights, subject only to a determination that Stein & Day had in fact recouped its advance. Bookcrafters was awarded the remaining one-third of the payments.
 
 
 8
 The district court referred the recoupment issue to a magistrate, who found $3,303.59 had not been recouped. On January 26, 1988 Judge Owen adopted the magistrate's report and, based on the October 1987 opinion, divided the New Library payments two-thirds to Septembertide and one-third to Bookcrafters together with five percent interest on their respective portions. Stein & Day was awarded $3,303.59 from the New Library payments in order to recoup fully its advance. New Library was awarded its costs and attorney's fees amounting to $1,125.08 and $14,092 respectively. Final judgment embodying the above-recited dispositions was entered July 8, 1988.
 
 
 9
 Bookcrafters appeals from that judgment seeking all of the New Library payments and the unrecouped advance monies together with interest at nine percent. Septembertide cross-appeals also claiming that it is entitled to all of the New Library payments, and that New Library is not entitled to costs and attorney's fees against it. For the reasons that follow, we modify as to the $3,303.59 awarded Stein & Day, which belongs instead to Bookcrafters, and otherwise affirm.
 
 DISCUSSION
 I Materiality of Stein & Day's Breach
 
 10
 One of Septembertide's principal arguments is that Stein & Day's failure to make the final $125,000 installment payment to it was so material a breach of the Hardcover Agreement as to permit rescission. Septembertide urges that when Stein & Day experienced financial difficulties, it deliberately withheld funds from the Author--either to save itself or to favor its creditor, Bookcrafters--despite having structured its transaction with New Library so that the Paperback funds would enable it to pay Septembertide. These facts, Septembertide asserts, demonstrate not only that Stein & Day's breach was intentional, but that it was also material. Septembertide accordingly believes it is entitled to rescind the contract and succeed to all rights held by Stein & Day, particularly Stein & Day's right to direct payment to it of all of the funds in New Library's hands.
 
 
 11
 The classic expression of law governing this diversity case is found in Callaman v. Powers, 199 N.Y. 268, 92 N.E. 747 (1910). There New York's highest court explained that before rescission will be permitted the breach must be "material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." Id. 199 N.Y. at 284, 92 N.E. 747. As an extraordinary remedy, rescission is appropriate only when a breach may be said to go to the root of the agreement between the parties. See Canfield v. Reynolds, 631 F.2d 169, 178 (2d Cir.1980). The composer Bob Nolan's famous 1929 song "Tumbling Tumbleweeds" was the subject of a rescission action instituted by Nolan against the Sam Fox Publishing Co., to which he had assigned the song and copyright. See Nolan v. Sam Fox Publishing Co., 499 F.2d 1394 (2d Cir.1974). Nolan's action was based on Fox's failure to pay him a substantial percentage of royalties due him, determined at a hearing to be 74 percent. But because Fox did pay 26 percent of the royalties due Nolan, we held that the breach was not so substantial as to permit rescission because there was not a total failure of payment.
 
 
 12
 By contrast, in Frankel v. Stein & Day, 470 F.Supp. 209 (S.D.N.Y.1979), aff'd, 646 F.2d 560 (2d Cir.1980), rescission was justified when a publisher failed to pay 67 percent of the amount it owed to an author. In Frankel, upon which Septembertide relies, the contract provided that all rights reverted automatically to the author if the publisher failed to pay any portion of what it owed. And, there, the failure was undoubtedly willful. See 470 F.Supp. at 213.
 
 
 13
 We think the instant case lies much closer to Nolan where the lack of payment was not willful. No willfulness may be inferred from the circumstances in the case at bar since it is plain that Stein & Day expected its successful launch of "Confessional" would alleviate its cash flow problems. Although this may have been careless wishful thinking, it was not willful. Moreover, Stein & Day paid 67 percent of the amount it owed Septembertide, only failing to pay the final one-third--a far cry from a total failure to pay. Unlike Frankel with its specific reversion rights to an author upon failure to make any payment, we cannot say that Stein & Day's breach was so substantial as to "defeat the object of the parties in making the contract." Nolan, 499 F.2d at 1397.
 
 II Third-Party Beneficiary
 
 14
 Was Septembertide properly held to be an intended beneficiary of the Paperback Agreement? Discussion must begin with Lawrence v. Fox, 20 N.Y. 268 (1859). There, one Holly loaned $300 to defendant stating at the time that he (Holly) owed the same sum to plaintiff and, in consideration of the loan, defendant promised to repay it to plaintiff the next day. It was held that plaintiff beneficiary could maintain an action on the promise defendant made for his benefit, even though plaintiff was not a party to or aware of the promise at the time it was made. Because this intent to benefit test was difficult to apply, see, e.g., Port Chester Elec. Constr. Corp. v. Atlas, 40 N.Y.2d 652, 655, 389 N.Y.S.2d 327, 357 N.E.2d 983 (1976), New York's Court of Appeals subsequently adopted the Restatement (Second) of Contracts approach. The Restatement formulation captures the essence of New York law. See Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., Inc., 66 N.Y.2d 38, 44-45, 495 N.Y.S.2d 1, 485 N.E.2d 208 (1985). Section 302 of the Restatement distinguishes between an "intended" and an "incidental" beneficiary as follows:
 
 
 15
 (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
 
 
 16
 (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
 
 
 17
 (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.
 
 
 18
 (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.
 
 
 19
 Applying New York law to the present facts, we conclude that Septembertide plainly is an intended beneficiary of the Paperback Agreement between Stein & Day and New Library. To reach that determination, we must examine the intent of the parties--as revealed in their agreement--and the surrounding circumstances. See Owens v. Haas, 601 F.2d 1242, 1250 (2d Cir.1979); Fourth Ocean, 66 N.Y.2d at 45, 495 N.Y.S.2d 1, 485 N.E.2d 208.
 
 
 20
 Septembertide's rights as a third-party beneficiary hinge on its demonstration of Stein & Day's intent to benefit it at the time the two agreements were entered into. Goodman-Marks Associates, Inc. v. Westbury Post Associates, 70 A.D.2d 145, 148, 420 N.Y.S.2d 26 (2d Dep't 1979). The timing, language, and financial obligations created by the Hardcover and Paperback Agreements shed much light on Stein & Day's intent. The former agreement, signed on December 12, 1984, was entered into virtually simultaneously with the latter. The timing of the two agreements and the mention by name of the author and his Work suggest that Stein & Day intended New Library's payments to it under the Paperback Agreement to be used to satisfy its obligation to Septembertide under the Hardcover Agreement.
 
 
 21
 The December 12 agreement--plainly referring to the Paperback Agreement of the previous day--states "[p]roceeds from the sale or license of reprint rights shall be divided two-thirds to the author [Septembertide] and one-third to the Publisher [Stein & Day]." The record reveals that Stein & Day used the first New Library advance installment to satisfy the first two $125,000 payments it owed Septembertide. Further, the district court found that since Stein & Day agreed--once its original advance had been recouped--to pay two-thirds of the paperback proceeds to the author, it owed a duty to Septembertide to transmit that share of the proceeds to it.
 
 
 22
 New Library's intent to benefit Septembertide is not quite so clear as that of Stein & Day's. Yet, Septembertide's argument that New Library is charged with some knowledge of the fact that it was to be benefitted under New Library's simultaneous contract with Stein & Day is a reasonable one. The Work and its author are identified in the Paperback Agreement. More significantly, Stein & Day acknowledged that it did not control British Commonwealth rights to softcover reprints, but would use its "best efforts" with the "author's agent" to protect New Library's softcover rights. We think this reference sufficiently alerted New Library to the fact that Septembertide had retained an interest in its Work and that Stein & Day maintained a working relationship with that author. New Library is also chargeable with knowing that it is a publishing industry practice for an author to receive a percentage of the royalty from the sublicense, particularly under the present circumstances where the two agreements were executed simultaneously.
 
 
 23
 As a consequence, Septembertide is an intended beneficiary of the promise made by Stein & Day to satisfy its obligation to Septembertide. A recognition of the author's rights to such performance was appropriate in effectuating Stein & Day's and New Library's purposes when the former granted a license to the latter for the rights to the paperback publication of the Work.
 
 III Security Interest
 
 24
 Bookcrafters argues that the district court erred in deciding that the author's rights in the Paperback Agreement were superior to its rights as an assignee with a secured interest in Stein & Day's contract rights and receivables. On Bookcrafters' motion for summary judgment for all payments due from New Library, the district court held that Bookcrafters was only entitled to such rights as Stein & Day could give. And, because Stein & Day was obligated to transfer to the author (Septembertide) two-thirds of the funds it received from New Library, Bookcrafters obtained rights only in the remaining one-third.
 
 
 25
 Bookcrafters urges that it is entitled to the full amount. It asserts that, under New York law, the fact that funds equal to two-thirds of the receivables from the paperback sales of "Confessional" were eventually to go to Septembertide as third-party beneficiary did not affect Stein & Day's right to grant a security interest in all of the receivables. It cites Recchio v. Manufacturers and Traders Trust Co., 55 Misc.2d 788, 286 N.Y.S.2d 390 (Sup.Ct. Genesee County 1968), rev'd on other grounds, 35 A.D.2d 769, 316 N.Y.S.2d 915 (4th Dep't 1970), for the proposition that a bona fide creditor in Bookcrafters' position may perfect a security interest, even when the debtor transferring the security interest does not actually own the collateral. It conducted a UCC filings search, its argument continues, and properly perfected its security interest; hence it should not be forced to bear the loss when its debtor (Stein & Day) breached a contractual obligation to a third party (Septembertide) regarding the collateral. To hold otherwise, Bookcrafters argues, would be to eviscerate the fundamental principle that secured interests are superior to unsecured interests. Contending that the security interest granted to it by the hard cover publisher is superior to Septembertide's rights as a third-party beneficiary, Bookcrafters therefore claims the right to all of the New Library payments.
 
 
 26
 We recognize that the issue of whether Septembertide's rights as a third-party beneficiary of the Paperback Agreement are superior to Bookcrafters' rights, as the secured creditor and assignee of Stein & Day, presents a difficult question of law. In resolving it, we look first to the security agreement.
 
 
 27
 In return for a $1,187,374 loan, Stein & Day executed and delivered a mortgage on certain of its real property. It also granted a security interest to Bookcrafters in tangible and intangible collateral. The tangible collateral included machinery, equipment, motor vehicles, appliances, fixtures, computers, goods, books, paper products, raw materials, files, records etc. "and all other tangible personal property owned by debtor." The intangible collateral--the subject with which we are concerned--included "all of debtor's contract rights ... subsidiary rights contracts ... all of debtor's accounts receivable ... and all rights to payments of money...." Stein & Day represented that it was "the owner of the collateral free from any prior claim, lien, security interest or encumbrance....", and that its title and interest in the intangible collateral "is not subject to any defense, offset, counterclaim or claim...." The 30-page agreement was comprehensive and thorough. Several exhibits were attached to it stating the locations where the debtor's collateral was kept and itemizing the subsidiary rights contracts, including the December 11, 1984 contract Stein & Day had with New Library regarding "Confessional," which is the contract on which Bookcrafters bases its claim.
 
 
 28
 We examine next the law of secured transactions. To create an enforceable security interest: (1) a debtor must sign a security agreement that describes the collateral; (2) value must be given; and (3) the debtor must have rights in the collateral. See NYUCC Sec. 9-203(1) (McKinney's Supp.1988). Concededly, Stein & Day signed the security agreement that contained a thorough description of the collateral, and for which value was given.
 
 
 29
 Thus, the question is whether (3) Stein & Day had rights in the collateral that it could assign to Bookcrafters. Bookcrafters advances several arguments to support its assertion of a valid security interest in all of the New Library payments. For example, it contends that Stein & Day was not a mere conduit for money passing from New Library to the author, and that these funds were not earmarked or segregated for Septembertide's account. The money coming in could be commingled and used by Stein & Day as it saw fit. We agree that such accurately describes the flow of funds. Further, Septembertide granted Stein & Day the authority, under the hardcover publishing agreement, to license the paperback version and to receive payments from such license. It took the risk, so Bookcrafters urges, that these funds might become encumbered to third parties. Now that they are encumbered, it cannot take back what it bargained away.
 
 
 30
 Most importantly, Bookcrafters continues, the author could have protected its interests with a security agreement or a non-assignment provision. Its failure to do so in the face of Stein & Day's and Bookcrafters' commercially reasonable actions makes Septembertide's third-party interest subordinate to Bookcrafters' security interest in the subject funds. Bookcrafters asserts that when the true owner of property allows another party to appear as owner, and that other party assigns the property to a third party that acts in good faith, the rights of the third party may be superior to those of the true owner. See, e.g., Monroe Abstract & Title Corp. v. Giallombardo, 54 A.D.2d 1084, 1085 (4th Dep't 1976). Moreover, Bookcrafters claims that the district court erred when it focused not on the assignment of the rights in the Paperback Agreement, but on the collateral Hardcover Agreement between the author and Stein & Day. It completes that argument by noting that defenses flowing from collateral agreements do not defeat an assignee's interest. See Bank Leumi Trust Co. v. Collins Sales Serv., Inc., 47 N.Y.2d 888, 890 (1979).
 
 
 31
 Although these contentions are seemingly persuasive, when taken together they are fundamentally flawed. Bookcrafters' assertions that Stein & Day could commingle funds and control paperback licensing rights are not in dispute, but they are largely irrelevant. What is most significant in our view is that Stein & Day assigned to Bookcrafters "all of [its] contract rights." The assignment did not purport to assign an interest in "all of the monies payable under the Paperback Agreement." The rights to the two-thirds of those funds had been previously transferred to Septembertide. Hence, they could not lawfully thereafter be assigned to Bookcrafters because an assignor cannot assign that which it no longer owns or controls. See International Ribbon Mills, Ltd. v. Arjan Ribbons, Inc., 36 N.Y.2d 121, 126, 365 N.Y.S.2d 808, 325 N.E.2d 137 (1975) ("It is elementary ancient law that an assignee never stands in any better position than his assignor. He is subject to all the equities and burdens which attach to the property assigned because he receives no more ... than his assignor."); Caribbean Steamship Co., S.A. v. Sonmez Denizcilik Ve Ticaret A.S., 598 F.2d 1264, 1266-67 (2d Cir.1979). See also White & Summers, Uniform Commercial Code, Sec. 23-4 at p. 795 (1972).
 
 
 32
 We agree with the district court that Bookcrafters' security interest was subject to Septembertide's third-party interest in the Paperback Agreement. Defenses may properly be asserted against an assignee (here Bookcrafters) that are "based on facts existing at the time of the contract." See Restatement of Contracts Sec. 167(1). Here, of course, Septembertide's rights and its claim to two-thirds of the Paperback income from New Library derives from a contract in existence at the time of Stein & Day's assignment to Bookcrafters.
 
 
 33
 Moreover, UCC Sec. 9-318(1)(A) provides that the rights of the assignee (Bookcrafters) are subject to "all the terms of the contract between the account debtor (New Library) and assignor (Stein & Day) and any defense or claim arising therefrom." It has always been the law in New York that an assignee stands in the shoes of its assignor and takes subject to those liabilities of its assignor that were in existence prior to the assignment. See Seibert v. Dunn, 216 N.Y. 237, 245-46, 110 N.E. 447 (1915); Arjan Ribbons, Inc., 36 N.Y.2d at 126, 365 N.Y.S.2d 808, 325 N.E.2d 137. As a consequence, Bookcrafters' rights in monies New Library owed to Stein & Day did not include the author's two-thirds share, which had vested in Septembertide upon execution of the Publishing and Paperback Agreements. Once vested, the author's third-party rights could not be assigned without its consent.
 
 
 34
 In sum, Bookcrafters possessed a valid and enforceable security interest under the UCC. But in taking a security interest in its assignor's property, it cannot claim rights in the property that were not the assignor's to give. Stein & Day's "rights in the collateral" were limited in this respect to a one-third share of the funds that New Library was free to alienate.
 
 
 35
 It seems fair to require, as between a trade creditor and an author, that the creditor-assignee prudently ascertain the actual existence of its collateral before agreeing to take a security interest in it. In this case the security interest contract was comprehensive. An examination by Bookcrafters of the publishing Hardcover Agreement, flagged by the Paperback Agreement, would quickly have revealed Septembertide's interest and the corresponding reduction in the assignor's rights in the debtor's collateral. Bookcrafters admits that its financing of Stein & Day reflected a customary assignment in the industry of a publisher's receivable. As a creditor lending to a book publisher, Bookcrafters was effectively on notice of the fact that its assignor-debtor, Stein & Day did not own (and therefore could not validly assign) the two-thirds of the paperback royalties owing to the author.
 
 
 36
 In resolving the question of priority between a secured creditor and an intended third-party beneficiary whose interests in the collateral preceded it, a first in time, first in right rule applies. It is the existence of Septembertide's earlier rights that tied Stein & Day's hands and prevented it from assigning to Bookcrafters that two-thirds share of the funds which had previously vested in Septembertide. Because Stein & Day's rights in the contract receivables were thereafter limited to a one-third share, Bookcrafters can claim no more.
 
 IV Remaining Issues
 A. Costs and Attorney's Fees
 
 37
 We now consider whether New Library is entitled to costs and attorney's fees. A bit more background is necessary. After Stein & Day failed timely to make its final $125,000 payment, Septembertide's counsel wrote two letters in May 1986 notifying New Library of the breach. The letters claimed that Septembertide had succeeded to Stein & Day's interest in the Paperback Agreement and demanded that future payments under that Agreement be made to it rather than Stein & Day. Septembertide further stated that it intended to honor the Paperback Agreement, explicitly confirming New Library's right to publish the paperback edition of the Work, which publication occurred in July 1986.
 
 
 38
 On July 14, 1986 Septembertide instituted the present litigation against Stein & Day and New Library (but not Bookcrafters), and sought by way of a temporary restraining order to prevent New Library from making any advance payments to Stein & Day. On July 24 New Library asserted an interpleader claim as a counterclaim against Septembertide, and made a cross-claim against Stein & Day and Bookcrafters. For the next six months New Library attempted to obtain agreement among the parties to pay the paperback funds into court or in an escrow account. Only Septembertide refused to agree. Instead, it moved for summary judgment on its contract claims against all defendants and to dismiss New Library's interpleader action, taking the position that New Library was not a stakeholder entitled to such relief. New Library cross-moved for summary judgment on its interpleader claim and successfully obtained a court order granting it leave to deposit the paperback funds into court in an interest-bearing bank account.
 
 
 39
 The district court granted New Library an award of costs and attorney's fees in the amount of $1,125.08 and $14,092.00 respectively to be satisfied out of Septembertide's portion of New Library's payments. On appeal, Septembertide claims that New Library was not a disinterested stakeholder, and that even if it is entitled to the award, payment should be made from the interpleader fund as a whole, not solely from its share.
 
 
 40
 To avoid exposure to double or multiple liability, Fed.R.Civ.P. 22(1) permits a party acknowledging its indebtedness to join those parties having claims against it. To assess fees and costs in favor of the stakeholder, a court of equity must find that (1) a disinterested stakeholder, (2) who had conceded liability, (3) has deposited the disputed funds into court, and (4) has sought a discharge from liability. 3 A. Moore's Federal Practice p 2.16 (2d ed. 1989). The fact that New Library did not initiate the interpleader action, but asserted it as a counterclaim is not relevant when considering a stakeholder's disinterestedness. See Fed.R.Civ.P. 22(1) ("A defendant exposed to similar liability may obtain such interpleader by way of cross-claim or counterclaim."); A/S Krediit Pank v. Chase Manhattan Bank, 303 F.2d 648, 649 (2d Cir.1962). We are satisfied that New Library met the above criteria and that the district court's findings support the exercise of its discretion.
 
 
 41
 Plainly, New Library is a disinterested stakeholder. It was not to blame for the instant litigation. Had it granted Septembertide's request and paid the paperback funds directly to it, New Library may have later been exposed to liability from Stein & Day and Bookcrafters, which is precisely the dilemma that Rule 22 seeks to avoid. On the contrary, it was Septembertide's unreasonable litigation posture that prevented New Library from following the ordinary interpleader sequence of depositing the funds in court and then being dismissed from the suit. Bad faith, fraud and the like are not requisite to such an award. A disinterested stakeholder who asserts interpleader is entitled to be awarded costs and attorney's fees. These are generally awarded against the interpleader fund, but may, in the discretion of the court, be taxed against one of the parties when their conduct justifies it. See Prudential Insurance Company of America v. Boyd, 781 F.2d 1494, 1497-98 (11th Cir.1986). Septembertide's conduct justified the district court in taxing these costs and fees against it, rather than against the interpleader fund.
 
 B. Interest
 
 42
 The district court determined that New Library should pay five percent interest on the paperback funds from July 24, 1986, the date it filed its interpleader counterclaim, to December 23, 1987, the date it deposited the payments into court. Bookcrafters and Septembertide contend that the interest for this 17-month period should be at a rate of nine percent. They correctly contend that state law controls, see United Bank Ltd. v. Cosmic International, Inc., 542 F.2d 868, 877 (2d Cir.1976). Their position is that property or contract actions are governed by N.Y. CPLR 5004 that mandates interest of nine percent. An exception exists when a money claim arises in an equity action, in which case the interest up to the time of the decision is within the court's discretion. N.Y. CPLR 5001(a).
 
 
 43
 Looked at from Septembertide's or Bookcrafters' perspective, the case at hand sounds in contract because that is the nature of the relief they seek against each other. See Lewis v. S.L. & E., Inc., 831 F.2d 37 (2d Cir.1987). Of course, insofar as New Library--the party paying the interest--is concerned the relief it sought in its interpleader action was equitable in nature. See United Bank, 542 F.2d at 878. Since New Library was not responsible for the delay in paying the money into court, we think the district court was well within its discretion when it applied the equitable standard and fixed the interest on the funds at five percent under N.Y. CPLR 5001(a).
 
 CONCLUSION
 
 44
 Of the remaining several issues raised none are of sufficient merit to warrant discussion, with one exception. The $3,303.59 that the magistrate found Stein & Day was entitled to so as to complete recoupment of its advance to Septembertide was incorrectly ordered by the district court to be paid to Stein & Day. This direction runs counter to the district court's holding that whatever was not payable to Septembertide was owed to Bookcrafters in light of the security agreement which assigned it those interests to which Stein & Day was entitled. The $3,303.59 therefore should be payable to Bookcrafters. The judgment appealed from is modified by directing the $3,303.59 ordered to be paid to Stein & Day to be paid instead to Bookcrafters, and as modified, the judgment is otherwise affirmed.
 
 
 45
 Modified, and as modified, affirmed.