Dennis J. JOHNSON

v.

**ELECTROLUX CORPORATION**

and

**Northwestern Mutual Life Insurance Company.**

**Civ. No. B–90–365 (JAC).**

United States District Court,
D. Connecticut.

May 8, 1991.

David S. Golub, Jonathan M. Levine, Silver, Golub & Teitell, Stamford, Conn., for plaintiff.

Paul E. Knag, Deborah L. DeHart, Cummings & Lockwood, Hartford, Conn., for defendant Electrolux Corp.

Robert C. Walsh, Jr., Day, Berry & Howard, Hartford, Conn., for defendant Northwestern Mut. Life Ins. Co.

## RULING ON PENDING MOTIONS

JOSÉ A. CABRANES, District Judge:

Plaintiff Dennis J. Johnson is the former chairman and chief executive officer of defendant Electrolux Corporation ("Electrolux"). This case began originally as two separate lawsuits in Connecticut Superior Court. The first consisted of plaintiff's allegations that he was terminated in violation of his Employment Agreement of October 30, 1987, *see* Affidavit of Dennis J. Johnson (filed Nov. 13, 1990) ("Johnson November 13 Affidavit"), Exhibit A ("Employment Agreement"), and that, pursuant to the Employment Agreement, he is entitled to receive his full salary through the date on which the dispute between him and Electrolux over his termination is resolved by agreement, final arbitration, or final judgment. Furthermore, plaintiff alleged that, pursuant to a Stock Subscription Agreement entered into at the same time as the Employment Agreement, plaintiff was entitled to require Electrolux to purchase his 30,000 shares in the company for the fair market value of the stock as of November 1, 1989.

On July 23, 1990, defendant filed a Notice of Removal pursuant to 28 U.S.C. § 1441(b), claiming that this court has original jurisdiction of plaintiff's cause of action under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001–1461 ("ERISA"), 1132(e)(1) (1988). Plaintiff originally objected to the removal, arguing that ERISA is inapplicable to the salary and stock claims.

The second case consisted of plaintiff's claims against both Electrolux and defendant Northwestern Mutual Life Insurance, Co. ("Northwestern Mutual") for an order compelling defendants to maintain and/or reinstate plaintiff's employee benefits plans as required by the Employment Agreement. Plaintiff did not dispute that *this* action was brought pursuant to ERISA, and defendant also removed it to federal court. On November 1, 1990, the parties entered into a Stipulation (approved Nov. 8, 1990) ("Stipulation") according to which both cases were consolidated before me.

The following motions are currently pending: (1) Plaintiff's Motion for Partial Summary Judgment (filed Nov. 13, 1990); (2) Plaintiff's Motion for Partial Summary Judgment, Declaratory Judgment & Preliminary Injunction to Compel Compliance with Plaintiff's Stock Subscription Agreement (filed Dec. 21, 1990); (3) Defendant's Cross–Motion for Partial Summary Judgment (filed Feb. 25, 1991); (4) Northwestern Mutual Life Insurance Company's Motion for Attorney's Fees and Costs (filed Jan. 2, 1991). These motions were submitted for decision after a hearing and oral argument on March 8, 1991.

## I. BACKGROUND

Prior to October 30, 1987, Electrolux was a wholly owned subsidiary of Sara Lee Corporation ("Sara Lee"). Electrolux's principal business was the manufacture and sale of home vacuum cleaners. Plaintiff had been employed by Electrolux for twenty-three years, and since July 1986, he had held the positions of president and chairman of the board. In October 1987, First Boston Securities Corporation ("First Boston") and Wesray Capital Corporation ("Wesray") arranged a so-called leveraged buyout of Electrolux, whereby First Boston and Wesray purchased it from Sara Lee for approximately $230 million. Plaintiff and other senior management participated in the buyout, and plaintiff purchased 6% (or 30,000 shares) of Electrolux's stock.

Concurrent with the buyout, plaintiff entered into the Employment Agreement with Electrolux providing for his continued employment as chairman of the board and president through October 30, 1990. Although the precise facts are vigorously disputed by the parties, it is undisputed that plaintiff submitted a letter of resignation to Electrolux on May 1, 1990. Plaintiff

contends that First Boston and Wesray "caused Electrolux to remove plaintiff from his positions as chairman and chief executive officer ... [by requiring] plaintiff to submit a prepared letter of resignation from these positions...." Plaintiff's Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment (filed Nov. 13, 1990) ("Plaintiff's Memorandum on Salary Claims") at 7. Defendant argues that after the October 1987 buyout, plaintiff ran Electrolux into the ground, leaving it close to bankruptcy; "[f]inally, with Electrolux facing impending financial disaster, on May 1, 1990, John Howard, plaintiff's strongest supporter on the Board of Directors, suggested to plaintiff that he consider resigning, and plaintiff voluntarily did so on May 1, 1990." Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment (filed Jan. 18, 1991) ("Defendant's Memorandum on Salary Claims") at 6.

At the time of the buyout and concurrent with the Employment Agreement, plaintiff and other senior management executed identical Stock Subscription Agreements, *see* Affidavit of Dennis J. Johnson (filed Dec. 21, 1991) ("Johnson December 21 Affidavit"), Exhibit A ("Stock Subscription Agreement"), and, along with all of the shareholders in the new company, they also executed Stockholders' Agreements, *see* Johnson December 21 Affidavit, Exhibit B ("Stockholders Agreement"). The Stock Subscription Agreement contains a "call option," permitting Electrolux to purchase plaintiff's stock at the appraised value determined as of November 1 of each year if his employment terminates for any reason. Stock Subscription Agreement, ¶¶ 1.11, 5.2(c), & 5.2(f). However, the call option is subject to a provision of the Stock Sub-

scription Agreement permitting the company, under certain circumstances, to extend the period of its option until the termination of any "Violation" or "Financing Default." *Id.*, ¶ 5.2(e). The Stock Subscription Agreement also contains a "put option," permitting plaintiff to force Electrolux to purchase his stock at the same November 1 value in the event that plaintiff's employment is wrongfully terminated by the company and if the company does not exercise its call option. *Id.*, ¶¶ 1.11, 5.1(c), & 5.1(e).

As discussed above, after May 1, 1990, plaintiff no longer held the position of president and chairman of the board. On July 19, 1990, Electrolux gave plaintiff timely notice of its intention to exercise its call option. However, Electrolux also indicated on July 19, 1990 that it was deferring actual purchase of the shares because the financial conditions of the company were such that the exercise of the call option would result in a "violation" as defined in the Stock Subscription Agreement, *id.*, ¶ 6.1. In addition, Electrolux notified plaintiff that the company was considering restructuring its capital structure due to its severe financial difficulties. It notified plaintiff that the shareholders of Electrolux who elect not to participate in the proposed restructuring will be "cashed out in the Merger and will receive nominal consideration in exchange for their shares of stock of Electrolux." Johnson December 21 Affidavit, Exhibit D (Letter dated July 19, 1990 from Richard E. Wenz to Dennis J. Johnson) ("Letter of July 19, 1990") at 2. On September 7, 1990, Electrolux underwent a "restructuring."[1] On September 14, 1990, Electrolux notified all non-participating shareholders that the merger had taken place, that their stock was being

---

**1.** Defendant describes the "restructuring" in the following manner:

> [A] Company known as Electrolux Acquisition Corporation ("NEWCO") was merged into Electrolux ("Old Electrolux") and Electrolux ("New Electrolux") was the surviving corporation. The Banks [National Bank of Boston, Wells Fargo Bank, and CIBC, Inc.] and [its former parent] Sara Lee became the owners of New Electrolux. Plaintiff had an opportunity to participate in the Restructuring along

with the other Participating Shareholder. However, this required additional investment and the plaintiff elected not to participate. Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment, Declaratory Judgment and Preliminary Injunction to Compel Compliance with Plaintiff's Stock Subscription Agreement and in Support of Defendant's Cross Motion for Partial Summary Judgment (filed Feb. 25, 1991) ("Defendant's Memorandum on Stock Claims") at 9.

"cashed out," and that they could petition for appraisal under Delaware law if they disputed the cash-out price. *Id.*, Exhibits F & G. Accompanying the September 14, 1990 notice was a check from Electrolux to plaintiff in the amount of $600.

## II. DISCUSSION

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original). While the court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), a party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The non-moving party may defeat the summary judgment motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Finally, " 'mere conclusory allegations or denials' " in legal memoranda or oral argument are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir.1978)).

### A. *Plaintiff's Motion for Partial Summary Judgment*

▇ Plaintiff argues that he is entitled to summary judgment on his claim for continued salary payments pending resolution of his dispute with Electrolux over the nature of his separation from the company. In addition, plaintiff contends that he is entitled to the maintenance and/or the reinstatement of all of his benefit plans, including the cash surrender value of his Split Dollar Life Insurance Agreement. *See* Johnson November 13 Affidavit, Exhibit I ("Split Dollar Agreement") (life insurance policy the premiums of which were shared by company and executive).

Plaintiff argues that he is entitled to partial summary judgment based on the plain meaning of certain paragraphs of the Employment Agreement. Paragraph 8(c) of the Employment Agreement provides that

[i]f the Executive's employment shall be terminated by the Company for Cause or by the Executive for other than Good Reason, the Company shall pay the Executive his full salary through the Date of Termination at the rate in effect at the time Notice of Termination is given and the Company shall have no further obligations to the Executive under this Agreement.

Employment Agreement, ¶ 8(c). Paragraph 8(d) provides that if Electrolux breaches the Employment Agreement or if Mr. Johnson terminates his employment for Good Reason,

the Company shall pay the Executive his full salary through the Date of Termination at the rate in effect at the time Notice of Termination is given and all other unpaid amounts, if any, to which the Executive is entitled as of the Date of Termination....

*Id.*, ¶ 8(d)(i). The "Date of Termination" is defined in the Employment Agreement as

the date on which a Notice of Termination is given; provided, however, that, if within thirty (30) days after any Notice of Termination is given the party receiving such Notice of Termination notifies

the other party that a dispute exists concerning the termination, the Date of Termination shall be the date on which the dispute is finally determined, either by mutual written agreement of the parties, by a binding and final arbitration award or by a final judgment, order or decree of a court of competent jurisdiction (the time of appeal therefrom having expired and no appeal having been perfected).

*Id.,* ¶ 7(f)(iv).

With respect to his claim for benefits payments, plaintiff relies primarily on paragraph 8(e), according to which

the Company shall maintain in full force and effect, for the continued benefit of the Executive for the greater of two years or the number of years (including partial years) remaining in the term of employment hereunder, all employee benefit plans and programs in which the Executive was entitled to participate immediately prior to the Date of Termination provided that the Executive's continued participation is possible under the general terms and provisions of such plans and programs.

*Id.,* ¶ 8(e). Finally, paragraph 15 of the Employment Agreement provides that plaintiff

shall be entitled to seek specific performance of his right to be paid until the Date of Termination during the pendency of any dispute or controversy arising under or in connection with this Agreement.

*Id.,* ¶ 15.

Plaintiff argues that the plain meaning of this "specific performance" provision was to preserve plaintiff's financial status quo while any dispute concerning his termination was resolved and to discourage Electrolux from using its superior financial resources to delay the final resolution of the dispute. *See* Plaintiff's Memorandum on Salary Claims at 19; *see also* Transcript of Hearing of March 8, 1991 (filed Apr. 5, 1991) at 6–7 ("[I]t's a punitive provision which basically says to Electrolux if you're going to dispute with this employee, you're going to have to pay him salary during the course of that dispute.").

There is no question that a dispute exists concerning the nature of plaintiff's separation from Electrolux. Plaintiff contends that he was terminated without cause, *see* Johnson November 13 Affidavit, Exhibit C (Letter dated May 25, 1990 from Attorney David S. Golub to Electrolux Corp.) ("Mr. Johnson takes the position that the company's actions on May 1, 1990 constituted a termination of his employment for reasons other than death, disability, or cause"); Electrolux contends that he voluntarily resigned from the company, *see* Johnson November 13 Affidavit, Exhibit F (Letter dated June 6, 1990 from Steven D. Cooper, General Counsel, to Attorney Richard A. Silver) ("In light of the fact that Mr. Johnson has submitted his 'resignation from the Company,' Electrolux is not under any obligation to continue to make payments to Mr. Johnson under the Employment Agreement").

Defendant argues that paragraph 7(f) of the Employment Agreement only entitles the party receiving a Notice of Termination to dispute the termination and thereby extend the "Date of Termination" until the dispute is resolved; because it was plaintiff who sent defendant a letter of resignation on May 1, 1990, plaintiff never received a Notice of Termination and has no right under the Employment Agreement to invoke paragraph 7(f). *See* Affidavit of Steven D. Cooper in Opposition to Plaintiff's Motion for Partial Summary Judgment Dated November 13, 1990 (filed Jan. 18, 1991), ¶¶ 9–10.

Although Electrolux disputes plaintiff's interpretation of the terms of the Employment Agreement, it contends further that even if the contract supported plaintiff's position, plaintiff has "breached his duties of care, good faith, fair dealing and loyalty by wrongfully diverting Electrolux funds and resources to his own benefit." Defendant's Memorandum on Salary Claims at 9. Therefore, Electrolux contends that plaintiff has forfeited his rights as a matter of law to any salary or benefits continuation under the Employment Agreement. *Id.* at 9–10; *see, e.g., Barisa v. Charitable Research Found., Inc.,* 287 A.2d 679, 682 (Del.Super.), *aff'd,* 299 A.2d 430 (Del.1972)

("To require an employer to continue to employ an administrator after the discovery of clandestine arrangements and his admission of surreptitious conduct would be contrary to established principles of law and morality." (citation omitted)) (interpreting Delaware law).

Plaintiff argues, however, that "[w]hile forfeiture of some benefits may be permitted under certain circumstances, the forfeiture provisions of any ERISA plan must be expressly stated, and an employer or plan administrator can only withhold ERISA benefits for those specified reasons." Plaintiff's Reply Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment (filed Feb. 28, 1991) at 6. Although plaintiff relies on *Chambless v. Masters, Mates & Pilots Pension Plan,* 772 F.2d 1032 (2d Cir.1985), *cert. denied,* 475 U.S. 1012, 106 S.Ct. 1189, 89 L.Ed.2d 304 (1986), for the proposition that ERISA plans must furnish to participants clear, timely explanations of "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits," *id.* at 1040, *Chambless* concerned an amendment to the plan adopted by the trustees that had the effect of depriving plaintiff of certain pension benefits. In this case, however, Electrolux argues that the plaintiff has forfeited his rights by breaching the covenant of good faith and fair dealing that is implied *by law* in every contract. Defendant's Memorandum on Salary Claims at 8–9.

Based on the full record before me, including the arguments and submissions of counsel, I find that there exist genuine issues of material fact that are in dispute that preclude the granting of partial summary judgment. "[O]n a motion for summary judgment the court cannot try issues of fact; it can only determine whether there are issues to be tried." *Schering Corp. v. Home Ins. Co.,* 712 F.2d 4, 9 (2d Cir.1983) (quoting *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1319–20 (2d Cir.1975)). Contrary to plaintiff's assertions, I find that the meaning of the Employment Agreement is ambiguous " 'when viewed objectively by a reasonably intelligent person who has examined the *context of the entire integrated agreement.' "* *Garza v. Marine Transport Lines, Inc.,* 861 F.2d 23, 27 (2d Cir.1988) (quoting *Walk–In Medical Centers, Inc. v. Breuer Capital Corp.,* 818 F.2d 260, 263 (2d Cir.1987)) (emphasis added). Specifically, whether or not plaintiff actually resigned on May 1, 1990—an issue of fact vigorously disputed by the parties—would affect not only *when* the Notice of Termination was given but *who,* precisely, was the party "receiving such Notice of Termination." The circumstances of the "termination" are undeniably in dispute, but even by the terms of the Employment Agreement, it is unclear whether a dispute *alone* is sufficient to trigger the salary continuation provisions.

Furthermore, defendant has raised serious doubt through the submission of accompanying affidavits as to whether plaintiff acted in good faith and whether he is even entitled to the benefits of the Employment Agreement. Of course, I intimate no view whatsoever on the underlying merits of plaintiff's claim or of defendant's counterclaim; should plaintiff ultimately prevail, Electrolux may be liable for all the salary and benefit payments that plaintiff now seeks. But on the record as it currently stands, genuine issues of material fact exist requiring that Plaintiff's Motion for Partial Summary Judgment (filed Nov. 13, 1990) be denied.

B. *Plaintiff's Motion for Partial Summary Judgment, Declaratory Judgment and Preliminary Injunction to Compel Compliance with Plaintiff's Stock Subscription Agreement and Defendant's Cross–Motion for Partial Summary Judgment*

■ Although plaintiff challenges the validity of the September 7, 1990 merger and the fairness of the cash-out price proffered by defendant, plaintiff has taken the position that his rights are controlled by the Stock Subscription Agreement. *See* Plaintiff's Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment, Declaratory Judgment and Preliminary Injunction to Compel Compliance

with Plaintiff's Stock Subscription Agreement (filed Dec. 21, 1990) ("Plaintiff's Memorandum on Stock Claims") at 13. By its terms, the Stock Subscription Agreement is to be interpreted according to Delaware law. Stock Subscription Agreement, ¶ 7.7.

Plaintiff relies on *Coleman v. Taub*, 638 F.2d 628, 631 (3d Cir.1981) for the proposition that a former employee's rights are governed by the stock buy-back provisions of a preexisting contract rather than by the statutory appraisal procedures and common law remedies afforded by Delaware law. Like Coleman, plaintiff here bargained for the right to be a shareholder but only so long as he remained an employee. Particularly in a closely-held corporation (which describes Electrolux after the 1987 leveraged buyout) and where "the public is not affected, there is no reason why an appeal to general fiduciary law should be used by either party as a pretext for evading his contractual obligations." *Id.* at 636. Since close corporations afford shareholders the opportunity to "bargain away" through contracts their right to continued participation in the corporate enterprise, "merger in such a case cannot have the disfavored effect of relegating the minority only to a statutory appraisal proceeding for a determination of its entire interest in corporate participation." *Id.* The Stock Subscription Agreement itself specifically anticipated future restructuring, and it provided that

> [t]he provisions of this Agreement shall apply, to the full extent set forth herein with respect to Common Stock, to any and all shares of capital stock of the Company or any successor or assign of the Company (whether by merger, consolidation, sale of all or substantially all of the assets of the Company or other-

wise) which may be issued in respect of, in exchange for, or in substitution of the Common Stock....

Stock Subscription Agreement, ¶ 7.4.

Defendant argues that, as a consequence of the September 7, 1990 merger creating the "new" Electrolux,[2] the stock of Electrolux ceased to exist and the Stock Subscription Agreement relating to the extinguished stock as well as the call option contained therein were rendered moot. *See* Defendant's Memorandum on Stock Claims at 13. Furthermore, Electrolux argues that paragraph 7.4 of the Stock Subscription Agreement provides that that agreement would "remain[ ] in effect only after a stock-for-stock merger and not after a cash-out merger such as is involved here." *Id.* at 18.

Plaintiff rejects the characterization of the September 7, 1990 merger as a "cash-out" merger, for only the non-participating shareholders were allegedly "cashed out"; the participating shareholders exchanged their Electrolux stock for equal shares in a company formed solely for the purposes of the merger, and then they exchanged these shares for equal shares of *new* Electrolux stock. *See* Plaintiff's Reply Memorandum Re: Stock Claims (filed Mar. 4, 1991) ("Plaintiff's Reply") at 3 n. *.[3] Plaintiff contends also that a binding executory contract was created when Electrolux sent notice to plaintiff on July 19, 1990 that Electrolux intended to exercise its call option. *Id.* at 3–4. Of course, the notice also stated that, in light of the financial conditions of the company, it could not exercise the option at that time and that it would notify plaintiff when the financial condition of the company had improved sufficiently so that the purchase of the shares pursuant to the call option would no longer result in a "violation" pursuant to paragraph 6 of the

---

**2.** *See supra* note 1.

**3.** *But see* Affidavit of Edmund J. Schwartz in Opposition to Plaintiff's Motion for Partial Summary Judgment, Declaratory Judgment and Preliminary Injunction to Compel Compliance with Plaintiff's Stock Subscription Agreement and in Support of Defendant's Cross Motion for Partial Summary Judgment (filed Mar. 7, 1991), ¶¶ 8–9 (characterizing merger as "cash-out" for all

shareholders except for Electrolux Acquisition Corporation, in which, "prior to and independent of the merger," all shareholders in old Electrolux had the option to invest). Nevertheless defendant's insistence on characterizing this merger as "cash out" rather than as "stock for stock" strikes me as excessively formalistic and wholly at variance with the substance of this transaction.

Stock Subscription Agreement. *See* Letter of July 19, 1990 at 1.[4] Furthermore, Electrolux previously represented to this court that the letter of July 19, 1990 gave notice of its intent to exercise its call option, and that, therefore, plaintiff was precluded from exercising his put option. *See* Defendant's Memorandum in Opposition to Application for Prejudgment Remedy and Preliminary Injunction (filed July 31, 1990) at 24–25. Defendant also represented to the court, in arguing against plaintiff's application to enjoin the September 7, 1990 merger that, "[u]nder this restructuring, Electrolux would remain liable for any debts to plaintiff, and would have a greatly enhanced ability to pay any such obligations." *Id.* at 7. Defendant shall not now be permitted to prevail on its argument that this same merger extinguished plaintiff's rights.

Based on the full record before me, I conclude that the Stock Subscription Agreement is an enforceable contract which survives the September 7, 1990 merger. Electrolux did indeed enter into a binding contract to exercise its call option, and plaintiff is entitled to enforce the call option in accordance with the terms of the Stock Subscription Agreement. Therefore, plaintiff is neither required to accept the post-merger cash-out price proffered by defendant nor to petition for appraisal under Delaware law, *see* Del.Code Ann. tit. 8, § 262 (1990). Plaintiff's Motion for Partial Summary Judgment, Declaratory Judgment & Preliminary Injunction to Compel Compliance with Plaintiff's Stock Subscription Agreement (filed Dec. 21, 1990) is granted and Defendant's Cross–Motion for Partial Summary Judgment (filed Feb. 25, 1991) is denied.

**4.** In his motion for summary judgment, plaintiff seeks only a declaration that the purchase of his shares is governed by the Stock Subscription Agreement and *not* by Delaware's statutory appraisal remedy. *See* Plaintiff's Reply at 5. The court does not now face, nor does it intimate any view concerning, the questions of when the stock must be repurchased and at what price.

In its cross motion for summary judgment, defendant argues that even if plaintiff has rights

### C. *Northwestern Mutual Life Insurance Company's Motion for Attorney's Fees and Costs*

Defendant Northwestern Mutual moves for attorneys fees and costs in connection with its interpleader action in this case. *See* Affidavit in Support of Defendant's Motion for Attorney's Fees (filed Mar. 8, 1991) (requesting $7,077.00 in fees and $345.07 in costs). Northwestern Mutual held three life insurance policies on the life of plaintiff which were owned by Electrolux. Plaintiff sued Northwestern Mutual to prevent it from honoring Electrolux's request to surrender the cash value of the policies; Electrolux, in turn, gave notice to Northwestern Mutual that it intended to terminate the insurance policies. Northwestern Mutual retained counsel in view of what it perceived to be the competing claims of the parties, and it filed an answer which included an interpleader in the form of a counterclaim and cross-claim.

The Stipulation approved by the court on November 8, 1990 provided that Northwestern Mutual would pay all amounts due pursuant to Electrolux's cancellation of the policies in conjunction with plaintiff's Split Dollar Agreement into an account to be held in escrow pending final judgment on plaintiff's claims against Electrolux. *See* Stipulation, ¶ 10, at 3–4. In December 1990, Northwestern Mutual sent Electrolux a check for $238,726.27 which is currently being held in escrow. *See* Defendant Electrolux's Opposition to Northwestern Mutual Life Insurance Company's Motion for Attorneys' Fees and Costs (filed Feb. 22, 1991) at 3. This check represented the proceeds paid to Northwestern Mutual pursuant to the Split Dollar Agreement. The Stipulation specified that it was without prejudice to Northwestern Mutual's filing of this motion for attorneys' fees and costs.

under the Stock Subscription Agreement, the existence of financing defaults and other "violations" would render plaintiff's demand for performance under the Stock Subscription Agreement "premature." As explained above, however, plaintiff is not now demanding such performance. The question of the demand's "maturity" will be considered if and when plaintiff chooses to make any such demand.

It is within the court's discretion to award attorneys' fees and costs to a successful interpleading plaintiff. The court must find that (1) a disinterested stakeholder, (2) who had conceded liability, (3) has deposited the disputed funds into court, and (4) has sought a discharge from liability. *Septembertide Pub., B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 683 (2d Cir.1989). Northwestern Mutual argues that it promptly commenced the interpleader action to promote an early resolution of the dispute and to prevent the further dissipation of the funds.

Plaintiff and Electrolux both oppose Northwestern Mutual's motion for attorneys' fees and costs. Both parties argue that the initiation of the interpleader was unjustified and that no legal work warranting the requested $7,422.07 in fees and costs was performed. Plaintiff's action against Northwestern Mutual did not assert a direct right to the proceeds of the Split Dollar Agreement; he sought only to garnish Northwestern Mutual as the "debtor" of Electrolux in order to safeguard the funds in light of Electrolux's financial difficulties. From this perspective, there was never a question of multiple claims of title to a single fund that would have justified an interpleader action. Furthermore, by the time Northwestern Mutual filed its interpleader, plaintiff had already instituted the second action against defendant Electrolux, which concerned, among other claims, the distribution of the proceeds of the Split Dollar Agreement. So, in effect, the parties had already "interpled" their dispute over the distribution of the proceeds from the Split Dollar Agreement by the time Northwestern Mutual's interpleader was filed.

I find both that Northwestern Mutual made little effort to resolve the conflict before filing its interpleader action and that this interpleader was simple, requiring no discovery and no complex legal research. However, Northwestern Mutual, through no fault of its own, was dragged into this contentious litigation, and I find that its counsel acted in good faith. Under the circumstances here presented, a modest award is justified. *See* J. Moore, J. Lucas,

& G. Grotheer, Jr., 3A *Moore's Federal Practice* § 22.16[2], at 22–174 (1990). The total amount of $1,000 is hereby awarded to defendant Northwestern Mutual's counsel for costs and fees to be assessed against the proceeds of the Split Dollar Agreement currently being held in escrow.

### III. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Partial Summary Judgment (filed Nov. 13, 1990) is DENIED. Plaintiff's Motion for Partial Summary Judgment, Declaratory Judgment & Preliminary Injunction to Compel Compliance with Plaintiff's Stock Subscription Agreement (filed Dec. 21, 1990) is GRANTED and Defendant's Cross–Motion for Partial Summary Judgment (filed Feb. 25, 1991) is DENIED; Northwestern Mutual Life Insurance Company's Motion for Attorney's Fees and Costs (filed Jan. 2, 1991) is GRANTED in part.

It is so ordered.